[No. B089504. Second Dist., Div. One. Aug. 21, 1996.]

DOUGLAS A. CLARK et al., Plaintiffs and Respondents, v.
CITY OF HERMOSA BEACH et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

**COUNSEL**

Michael Jenkins, City Attorney, Richards, Watson & Gershon, Rochelle Brown and Roxanne M. Diaz for Defendants and Appellants.

Rutan & Tucker, M. Katherine Jenson and Jeffrey M. Oderman for Plaintiffs and Respondents.

OPINION

MASTERSON, J.—Douglas and Cheryl Clark own a duplex in the City of Hermosa Beach, California (the City). In 1992, they applied to the Hermosa Beach Planning Commission for permits to demolish the duplex and replace it with a two-unit condominium. The commission approved the project. The matter was appealed to the city council (the Council). By a three-to-two vote, the Council denied the permits, finding the size of the proposed structure to be excessive.

The Clarks filed this action, seeking a writ of administrative mandate (Code Civ. Proc., § 1094.5) and alleging a violation of federal civil rights (42 U.S.C. § 1983). The trial court granted the writ petition, directing the City to rescind the Council decision and to reinstate the planning commission's approval of the project permits. The court also found for the Clarks on their civil rights claim, awarding them $213,300 in damages and $133,895.21 in attorney fees and litigation expenses.

On appeal, the City challenges the trial court's determination of liability, the award of damages, and the calculation of attorney fees and costs. In the published portion of this opinion, we conclude that the Clarks were deprived of a fair hearing before the Council and were accordingly entitled to a writ of mandate. However, the trial court erred in directing that the planning commission's decision be reinstated. Instead, the court should have ordered the Council to rehear the matter and provide a fair hearing. We further conclude that the trial court erred in finding that the City violated the Clarks' civil rights. In the unpublished portion of the opinion, we conclude that the trial court should not have awarded damages or attorney fees and should have disallowed certain cost items.

BACKGROUND

In 1982, the Clarks bought a duplex in the City, located at 2902 Hermosa Avenue, a block from the ocean. They rent out one of the units and use the other unit as their second home, making frequent visits to California from their primary residence in Phoenix, Arizona. The property is in an area designated as an R-3 zone, which is a multiple-family residential zone.

After purchasing the property, the Clarks hired an architect and developed plans to demolish the existing duplex and replace it with a two-unit condominium. In 1989, they applied to the planning commission for permits to

build a structure 35 feet high, with lot coverage of 65 percent—the maximum height and lot coverage allowed under City law. (Hermosa Beach Mun. Code, §§ 601, 606.)[1] The commission approved the project, finding that "[t]he site is . . . physically suitable for [the] type and density of the proposed development," and "[t]he project will conform to all zoning and condominium criteria and will [be] compatible with adjacent residential properties."

A local resident, Robert Benz, who lived a block inland from the Clarks, sought to overturn the commission's decision. He gathered signatures on five petitions, which stated that "the undersigned, being residents of the city of Hermosa Beach, hereby . . . appeal the issuing of the building permit for the [proposed project] on the basis that the construction of the building will adversely affect the views of neighboring homes." In a letter to the Council dated February 11, 1989, Benz stated: "The action taken by the City Planning Commission . . . is unacceptable to the wishes of the petitioners. The 35 foot height of the projected condominium proposal will further constrict the view of the ocean from homes that are located behind and to either side [of] the lot. [¶] . . . [¶] There seems to be a wanton disregard for the rights of others in the City of Hermosa Beach when it comes to the building of homes and condominiums. For their own financial gain, developers and speculators have continually proposed the building of high structures in order to maximize the incident view of the ocean for their own projects. The building of these structures limits the view of the neighboring homes solely to the sight of these excessively high structures. . . . It is time to stop the issuing of building permits that ignore the restriction of the view of others."

By letter of March 19, 1989, Benz requested that the City waive the fees for his appeal of the commission's decision. In a March 23, 1989, memo to the Council, Planning Director Michael Schubach advised against granting Benz's request: "Attached is a request to waive the fees for an appeal of a proposed 2 unit condo at 2902 Hermosa Avenue. [¶] The condo is in compliance with all zoning ordinance requirements; the City has no view ordinance, and the Planning Commission did not believe view blockage was so significant that conditions related to view should be imposed. [¶] . . . [¶] The staff can find no grounds to waive the appeal fees. . . ." Based on Schubach's memo, the Council declined to waive the fees, and Benz apparently did not further pursue the appeal.

After the approval of the Clarks' 1989 project, the City adopted a new setback requirement, necessitating that the Clarks revise their plans. In the

[1] Unless otherwise indicated, we refer to section 601 of the Hermosa Beach Municipal Code as it existed from October 1986 to September 1992. It stated: "No building shall exceed thirty-five (35) feet in height. . . ."

interim, the 1989 permits expired. In January 1992, the Clarks submitted another application for the requisite "permits" (i.e., a conditional use permit, precise development plan, and tentative parcel map) and paid $1,261 in processing fees. The proposed structure, a two-unit condominium, was—in the words of Planning Director Schubach—"very similar" to the one approved in 1989. For example, it had the same height (35 feet), though slightly smaller lot coverage (63.7 percent instead of 65 percent).[2]

By report dated January 28, 1992, the planning commission staff recommended approval of the project, noting that the Clarks' architect "consulted with staff early in the design process to ensure compliance with applicable code requirements." According to the report, "[l]ot coverage is at 63.7%, all the required setbacks have been met, and the height on the sloped lot is held within the 35 foot limit." The report concluded that the project complied with all planning and zoning conditions.

At the public hearing before the planning commission on February 4, 1992, Planning Director Schubach presented the staff report on the Clarks' plans and urged approval of the permits. Two City residents spoke against the project, arguing that new buildings should not exceed 30 feet in height. The commissioners then discussed the possibility of asking the City Council to adopt a moratorium on construction in R-3 zones until a decision could be made about reducing the 35-foot height limit to 30 feet. On that subject, one commissioner remarked: "I have somewhat of a problem with the idea that this project, which does conform to all the requirements, has been singled out . . . . I would much more favor dealing with this on its merits and recommending an action. I can understand the 30 ft. height limit as a policy. I think we should recommend action on that, but separate from action on this. I think that we're holding the [project] hostage to the other and that doesn't seem equitable." Another commissioner stated: "I think what I see here is an applicant that responded to the guidelines that we developed over time, in fact, this is the best response I've seen in the time I've been here of somebody really trying to do what we've asked them to do. I have a problem with trying to chang[e] the rules in midstream, that really creates a problem for me. . . . [W]e don't make zone changes based on an individual problem."

The commission ultimately voted, without dissent, to approve the Clarks' conditional use permit, tentative parcel map, and precise development plan.

---

[2]These figures on height and lot coverage were determined by the planning commission staff. We also note that, at the time of the Clarks' 1992 application, the maximum height and lot coverage allowed under City law had not changed since the approval of the Clarks' 1989 plans.

In doing so, the commission found that (1) the "[s]ite is zoned R-3 and is physically suitable for the type and density of the proposed development," (2) the "[d]esign of the proposed subdivision is compatible and consistent with the City's General Plan, and is compatible with the immediate environment," and (3) the "project will conform to all zoning and condominium criteria and will be compatible with neighboring residential properties." The commission also recommended that the City Council consider enacting a moratorium on construction in R-3 zones so that the planning staff could study the height issue.

On February 12, 1992, several residents appealed the commission's approval of the Clarks' project to the Council. The appeal, accompanied by petitions bearing numerous signatures, objected to "the spread of condominiums, and the ability of these new developments to build higher than thirty feet."

On or about February 25, 1992, the Council debated whether to impose a moratorium on the construction of buildings taller than 30 feet in R-3 zones, pending further study of the height issue. To be approved, such an interim ordinance required a four-fifths vote of the Council. (Gov. Code, § 65858.) The measure garnered three out of the five possible votes and therefore failed. Absent a moratorium, the Council directed that the planning commission hold public hearings to determine whether the R-3 height limit should be reduced to 30 feet.

Meanwhile, in connection with the appeal of the commission's decision on the Clarks' project, the planning staff gathered additional information for the Council. In a March 17, 1992, memo to the Council, the commission stated: "The subject location is in an area that has not had a considerable amount of development in the last 7 years. From staff's research, the last 7 years is the approximate time frame that development projects started to be constructed to the maximum height allowed. [¶] Also, from a 'window survey' of this area, it is estimated that most development in this area is 30 feet, or under.[3] [¶] In regard to view blockage, staff is unable to determine whether views from development would be any less blocked at 30 feet than at 35 feet. . . . [¶] If a significant impact is noted, a finding could be made, and as a condition of approval, a reduction in height could be required. [¶] However, it should be considered that if the adjacent property were to be recycled and built also to 35', any view lost may be restored."

A follow-up memo dated March 24, 1992, provided more specific information on the Clarks' project: "The residence directly adjacent to the north

---

[3]In the one block area east of the Clarks' property, approximately 75 percent of the houses are 30 feet in height or lower.

[of the Clarks' property] reaches the 35' height limit at the east half of the property. [¶] The height of the structure directly to the east is between 25' and 30' . . . . [T]he dwellings in the general area are 30 feet or less. However, there are some dwellings that reach as high as 40'. . . . [¶] The R-3 area in question, between Manhattan Ave. and Hermosa Ave., **drops down an average of 24' below the R-1 and R-2 zones** that are east of Manhattan Avenue. Therefore, in this case, allowing a 35' height limit in front of areas with 25' and 30' limits would not necessarily create view blockage. [¶] In the particular case of 2902 Hermosa Avenue, the building only reaches the 35 foot limit at the west end along Hermosa Avenue, and the east end of the building is only 28' above grade." (Boldface in original.)

On March 24, 1992, the Council held a public hearing on the appeal in the Clark matter. Present at the hearing were Councilmembers Robert Essertier, Sam Edgerton, Albert Wiemans, and Robert Benz.[4] (Councilmember Kathleen Midstokke was absent.) At the beginning of the hearing, Planning Director Schubach spoke against the appeal and in favor of sustaining the commission's decision. Immediately thereafter, a resident (and apparently a former councilmember), Jim Rosenberger, raised a "point of order," asking whether Councilmember Benz should recuse himself because he lived in close proximity to the proposed project and had opposed the Clarks' 1989 plans. In response, City Attorney Charles Vose stated that the location of Benz's apartment did not create a conflict of interest because Benz leased, rather than owned, his residence. Nor, according to Vose, did Benz's opposition to the Clarks' 1989 project establish bias. After Vose rendered this advice, the hearing proceeded. Benz did not recuse himself.

From the audience, 13 individuals (including Mr. Clark) spoke in favor of the project; 5 spoke against it. Those opposing the project thought that the proposed structure was too high and did not "fit" into the neighborhood. Mr. Clark stated that if the Council imposed a 30-foot height limitation on the structure, it would be "impossible" to build and would have to be "completely redesigned."

When the public portion of the hearing had concluded, Councilmember Essertier raised for the first time a concern with the lot coverage of the project. That issue is governed by section 229.1 of the Hermosa Beach Municipal Code, which states: " 'Lot coverage' shall include the footprint of

---

[4]Benz was elected to the Council in 1990. He was the same person who, as a private citizen, had opposed the Clarks' 1989 permits by circulating petitions and attempting unsuccessfully to appeal the commission's approval of the project. As of March 1992, Benz still lived in the same location (2901 Manhattan Avenue), where he leased a three-bedroom apartment on a month-to-month basis.

the building plus cantilevers and decks higher than thirty (30) inches above grade . . . ." Essertier believed that the planning commission had not included the Clarks' "deck" in calculating lot coverage. Under his interpretation of the municipal code, the lot coverage for the structure, including the "deck," exceeded the allowed amount (65 percent). In response to Essertier's statement, Planning Director Schubach explained that for over seven years, the planning commission had not treated courtyards or landings above subterranean garages—like the Clarks'—as "decks" and had not included them in determining lot coverage.[5] Councilmember Essertier further expressed his view that the project did not have sufficient "usable open space."[6]

Councilmember Wiemans summed up his position on the appeal as follows: "First, this is an R-3 neighborhood and we ought to consider it as R-3. We should not start to come up with a new method of prospective downsizing. What we need here is certainty of development, I mean, when people come here to build a home, they ought to know what they can expect. It shouldn't get every time down to the same point that these same five illustrious people here are going to come up with different standards, this is absolutely asinine."

At the end of the meeting, Councilmembers Essertier, Edgerton, and Benz voted to deny the permits without prejudice and to refer the matter back to the planning staff to develop findings consistent with the Council's views on the height, lot coverage, and open space issues.[7] Councilmember Wiemans voted against the appeal. The Council scheduled final action on the permits for April 14, 1992, and so informed the Clarks in writing.

By letter dated April 10, 1992, the Clarks' attorneys objected to the Council's having considered new issues—lot coverage and usable open

---

[5]According to the City, while the planning commission had consistently interpreted the lot coverage provision not to apply to "decks" like the Clarks', the Council had never reviewed or approved the commission's interpretation. Apparently, the Council had not considered the issue until the present case.

[6]The municipal code requires a minimum of 300 square feet of usable open/private space per condominium unit. (Hermosa Beach Mun. Code, §§ 607(2), 7.2-6(e)(1).) That space "shall not be enclosed on more than two (2) sides." (*Id.*, § 607(2).) The planning commission determined that the Clarks' project had 300.5 square feet of open space per unit—just barely over the required minimum. However, Councilmember Essertier asserted that since the structure's courtyard was enclosed on three sides, the commission had erred by treating it as open space. Such an error would have reduced the open space per unit by 85 square feet, clearly below what City law required. Planning Director Schubach believed that the courtyard had not been counted toward the open space requirement.

[7]By denying the permits "without prejudice," the City allowed the Clarks to submit revised plans (in accordance with the Council's height, lot coverage, and open space demands) without having to pay additional processing fees.

space—after the close of the March 24 public hearing. The letter noted that the Council had not applied the lot coverage requirement in accordance with the seven-year interpretation adopted by the planning commission and that the Clarks had not been given an opportunity to address the Council on the issues of lot coverage or open space.

At the April 14, 1992, Council meeting, the Clarks' attorney requested that the appeal be reheard. In a similar vein, Councilmember Wiemans moved to reopen the appeal and hold another public hearing. As Wiemans explained: "[Clark] was basically within the mill and then at the very tail end we, as a council, proposed additional requirements. Now, I'm suggesting to you that this is not the way to give people the benefit of the law—this is not the way to dispense equal justice. . . . I believe we are on the wrong side of the argument and my suggestion to this council would be we are to reconsider our entire line of reasoning. . . . [¶] . . . [¶] . . . [T]his applicant is in the final stages of what he wanted to do. He complied with what was the law at the time and what we are doing is taking away from him what the law provided."

Councilmember Midstokke had this to say: "As you know, recently we did attempt to implement an urgency ordinance regarding not allowing height over 30 feet while we study the height issue to be implemented and it could not reach four votes with this council. . . . I see a terrible precedent being set by this council in that they couldn't get four votes for an urgency ordinance so by a three vote majority on a project by project basis, they're going to deny anything that's 35 feet in the R-3 until they change the height down to 30 feet. They have denied this project. At the Planning Commission meeting last Tuesday night, two more projects were denied that were 35 feet in the R-3 zone. If the urgency ordinance had been adopted, all three of these projects would have been grandfathered. They would not have been stopped. The result of this council action and the action by the Planning Commission last Tuesday is that you are implementing an R-3 height change from 35 to 30 feet immediately. There is no notice, there's no public hearings, there's no urgency ordinance . . . . I think the Clarks deserve a rehearing on the issue of lot coverage and usable open space which was not brought up before, if they do not also deserve one on the height issue."

The motion to rehear the appeal failed, with Councilmembers Essertier, Edgerton, and Benz voting against it. Those three councilmembers then approved a resolution denying the Clarks' permits. The resolution stated in part that (1) "the requested development at the height and lot coverage ratio proposed is likely to interfere with the property values in the vicinity or interfere with the use or enjoyment of property in such area," (2) "[t]he

project exceeds the permissible lot coverage," (3) "the development, including, but not limited to, height and open space is not in character with the development standards of the surrounding area," and (4) "[t]he type of development proposed . . . would negatively impact the neighborhood's integrity and the character of the community." The resolution stated that the permits were denied without prejudice to the Clarks' submitting revised plans correcting the alleged deficiencies in height, lot coverage, and open space. Councilmembers Wiemans and Midstokke voted against the resolution.

On July 13, 1992, the Clarks filed this action against the City, the Council, and Councilmembers Essertier, Edgerton, and Benz. Two weeks later, the Clarks filed an amended pleading asserting two claims: (1) a petition for a writ of administrative mandate, alleging that the City had deprived the Clarks of a fair hearing and had abused its discretion (Code Civ. Proc., § 1094.5); and (2) a complaint alleging a violation of procedural due process (42 U.S.C. § 1983).[8] In September 1992, the Clarks dismissed the individual defendants without prejudice.[9]

On August 29, 1994, the trial court heard argument on the writ petition. The next day, after reviewing the administrative record and the parties' arguments, the trial court granted the petition on the grounds that: (1) the Clarks did not receive a fair hearing; (2) the City abused its discretion, in that it had not proceeded according to law and its decision was not supported by legally adequate findings, nor were the findings supported by the evidence; (3) the Clarks were denied due process; (4) Councilmember Benz had a conflict of interest under the Political Reform Act (Gov. Code, § 81000 et seq.)[10] and under common law, such that "[h]e was legally precluded from participating in the decision on the Project [p]ermits"; (5) the City applied standards to the Clarks' project that were not in effect at the time their application was complete, thus violating the Subdivision Map Act (Gov.

_____

[8]United States Code section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[9]On September 8, 1992, the City adopted a new ordinance restricting the height of buildings in R-3 zones to 30 feet unless specified conditions are satisfied, i.e., an extension above 30 feet is necessary to take advantage of a scenic view over surrounding structures *and* a substantial number of existing buildings in the vicinity are higher than 30 feet. (Hermosa Beach Ord. No. 92-1074, § 1.)

[10]In part, the Political Reform Act prohibits public officials from making, participating in, or attempting to use their official position to influence a governmental decision in which they know or have reason to know they have a financial interest. (Gov. Code, § 87100.)

Code, § 66410 et seq.);[11] and (6) the City's actions against the Clarks were discriminatory. The trial court ordered the City to set aside the Council's resolution denying the Clarks' permits and to reinstate the planning commission's decision approving the project.

In early October 1994, the trial court, sitting without a jury, heard testimony on the Clarks' civil rights claim. Witnesses included the Clarks and Councilmembers Essertier, Edgerton, and Benz.[12] At the close of the evidence, the court took the matter under submission. By minute order dated October 20, 1994, the court found for the Clarks, ruling that their right to due process had been violated. The court also awarded $213,300 in damages ($93,300 for increased development costs, $20,000 for emotional distress, and $100,000 for loss in property value).

In its statement of decision, the court explained that the City had violated the Clarks' rights to procedural and substantive due process because it had arbitrarily denied their permit application without a fair hearing. The court also found that the City had violated the Ralph M. Brown Act (Brown Act) (Gov. Code, § 54950 et seq.) since Councilmember Edgerton had held private discussions with three other councilmembers before the public hearing on the appeal from the planning commission.[13] Consistent with its ruling on the writ petition, the trial court again found that Councilmember Benz had a conflict of interest (under the Political Reform Act and the common law) which disqualified him from voting on the Clarks' project. The court

---

[11]With exceptions not applicable here, the pertinent section of the Subdivision Map Act provides that "in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, policies, and standards in effect at the date the local agency has determined that the application is complete . . . ." (Gov. Code, § 66474.2, subd. (a).)

[12]A portion of the trial focused on Benz's personal animosity toward the Clarks, which developed before his election to the Council. For example, according to Mr. Clark, it was fairly common for Benz to run by their windows and yell "loud, obnoxious noises in the morning." On one occasion at the beach, Benz and some of his friends were "horsing around" near the Clarks' children. Concerned for the children's safety, Mrs. Clark asked Benz to stop or go elsewhere. Benz refused and began mocking her. Further, Mrs. Clark testified that on a Friday night, Benz "walked over to our house and urinated on the house and in the planter." She called the police, who arrived promptly and directed Benz toward his apartment. The local press (the Daily Breeze) ran an article on this incident and quoted Benz as saying that Mrs. Clark wanted to see him urinate. At trial, Benz stated that his comment in the newspaper had been taken out of context, and he denied having urinated on the Clarks' property. However, the trial court expressly found that Benz had engaged in such conduct.

[13]In general, the Brown Act requires that all meetings of the legislative body of a local agency be open and public. (Gov. Code, § 54953, subd. (a).) To that end, the act prohibits "a series of nonpublic contacts at which a quorum of a legislative body is lacking at any given time . . . if the contacts are 'planned by or held with the collective concurrence of a quorum of the body to privately discuss the public's business' . . . ." (*Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 103 [214 Cal.Rptr. 561].)

also found a violation of the Subdivision Map Act on the theory that the City had applied standards to the Clarks' project that were not then in effect (e.g., a more restrictive, 30-foot height limitation and a new interpretation of the lot coverage requirement). The trial court based its award of damages on federal (42 U.S.C. § 1983) as well as state (Code Civ. Proc., § 1095) law. It authorized the Clarks to recover attorney fees and other litigation expenses, including expert witness fees, pursuant to title 42 United States Code section 1988(b), Code of Civil Procedure section 1021.5, and Government Code sections 800 and 91012.[14]

In late October 1994, the Clarks filed a motion seeking attorney fees (in the approximate amount of $180,000), expert witness fees (in the amount of $6,762.50), and costs (in the amount of $6,211.20).[15] The City opposed the motion. At a November 18, 1994, hearing, the trial court made clear that, despite its previous ruling in the statement of decision, it would not award attorney fees pursuant to Code of Civil Procedure section 1021.5.[16] However, the court reserved decision on whether to award fees pursuant to the other statutes mentioned in the statement of decision. By minute order dated November 23, 1994, the trial court awarded the Clarks $120,921.51 in attorney fees and the requested amounts for expert witness fees and costs. On November 14, 1994, the court entered judgment in favor of the Clarks, incorporating the order granting the writ of mandate and awarding $213,300 in damages and a total of $133,895.21 in attorney fees and costs. The City filed a timely appeal from the judgment.

DISCUSSION

The City contends that the trial court erred in issuing a writ of mandate and that, even if a writ were appropriate, the trial court should have sent the matter back to the Council for another hearing instead of simply reinstating the planning commission's approval of the permits. We conclude that the Clarks were deprived of a fair hearing before the Council, and, thus, a writ

[14]The prevailing party in a federal civil rights action is entitled to reasonable attorney fees. (42 U.S.C. § 1988(b).) Under Code of Civil Procedure section 1021.5, fees may be awarded where the successful party has enforced an important right affecting the public interest. Government Code section 800 permits an award of fees (not to exceed $7,500) if a party establishes that a public entity has engaged in arbitrary or capricious conduct. Finally, Government Code section 91012 authorizes the prevailing party in an action under the Political Reform Act to recover costs of litigation, including attorney fees.

[15]The request for costs included expenses for photocopying, telephone calls, telecopier use, and computer-assisted research.

[16]As the trial court stated, referring to Code of Civil Procedure section 1021.5: "That doesn't apply. CCP 1021.5, this is not attorneys fees in [the] public interest. This is not a public interest case. It was a private citizen situation. I will not grant attorney fees under that section."

was proper. However, the trial court erred in reinstating the decision of the planning commission. Instead, the writ should have directed the Council to provide a second, fair hearing on the matter.

As to the Clarks' federal civil rights claim, the City argues that it did not violate the due process clause. We agree. Because the Clarks did not have a protected property interest in the requested permits, the City did not violate the Clarks' right to procedural or substantive due process. In addition, as to the substantive due process claim, we find that the City did not engage in arbitrary or irrational conduct. Consequently, we reverse the finding of liability on the claim brought under title 42 United States Code section 1983.

I

*Writ of Mandate*

A trial court may issue a writ of administrative mandate where an agency has (1) acted in excess of its jurisdiction, (2) deprived the petitioner of a fair hearing, or (3) committed a prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the [agency] has not proceeded in a manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

■ As we see it, this case concerns whether the Clarks received a fair hearing before the Council. ■ That question is one of law, which we review de novo: " 'There might be foundational matters of fact with respect to which the trial court's findings would be conclusive on appeal if supported by substantial evidence. However, the ultimate questions, whether the agency's decision was . . . unlawful or procedurally unfair, are essentially questions of law. With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal.' . . . The review of procedural issues, whether presented in mandamus proceedings brought under Code of Civil Procedure section 1085 or 1094.5, should be the same. That is, foundational factual findings must be sustained if supported by substantial evidence; however, the ultimate determination of whether the administrative proceedings were fundamentally fair is a question of law to be decided on appeal." (*Rosenblit* v. *Superior Court* (1991) 231 Cal.App.3d 1434, 1443 [282 Cal.Rptr. 819], citations omitted.) The trial court's "fair hearing finding

was a conclusion of law, not a finding of fact, and requires a de novo review of the administrative record." (*Id.* at p. 1442.)[17]

## A. *Right to a Fair Hearing*

■ By statute, a writ is appropriate where the petitioner has been deprived of a fair hearing. (Code Civ. Proc., § 1094.5, subd. (b).) In applying this statutory principle, courts have recognized that "an individual has the right to a tribunal 'which meets . . . standards of impartiality.' . . . Biased decision makers are . . . impermissible and even the probability of unfairness is to be avoided. . . . The factor most often considered destructive of administrative board impartiality is bias arising from pecuniary interests of board members. . . . Personal embroilment in the dispute will also void the administrative decision . . . , although neither prior knowledge of the factual background which bears on a decision nor prehearing expressions of opinions on the result disqualifies an administrative body from acting on a matter before it. . . . [¶] . . . Our Supreme Court has declined to fix rigid procedures for the protection of fair procedure rights . . . , but it is inconceivable to us that such rights would not include impartiality of the adjudicators." (*Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648, 657-658 [163 Cal.Rptr. 831], citations omitted; accord, *Delta Dental Plan* v. *Banasky* (1994) 27 Cal.App.4th 1598, 1607-1609 [33 Cal.Rptr.2d 381] [writ of administrative mandate ensures right to "impartial tribunal"]; *Rosenblit* v. *Superior Court, supra,* 231 Cal.App.3d at p. 1448 ["The right to a fair procedure includes the right to impartial adjudicators."].)

■ Over 60 years ago, one Court of Appeal discussed the common law prohibition on conflicts of interest, stating: "A public officer is impliedly bound to exercise the powers conferred on him with disinterested skill, zeal, and diligence and primarily for the benefit of the public . . . . [¶] . . . [¶

---

[17]In reviewing the propriety of the trial court's writ of administrative mandate, the City contends that we cannot consider any evidence that was not before the Council at the time of its decision, i.e., not part of the formal administrative record. In particular, the City objects to evidence concerning the approval of, and Mr. Benz's opposition to, the Clarks' 1989 permit application. Such an objection might be well taken if we were determining whether the Council's decision was supported by substantial evidence. (See *Housman* v. *Board of Medical Examiners* (1948) 84 Cal.App.2d 308, 313 [190 P.2d 653].) However, where the challenge involves one of procedural fairness, including the potential bias of a councilmember, we are not necessarily limited to the evidence that was before the Council. (See Cal. Administrative Mandamus (Cont.Ed.Bar 1989) § 4.36, p. 120; *id.,* § 4.120, pp. 171-172; see also *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 573, 575, fn. 5, 578-579 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [in reviewing quasi-legislative administrative decision, extra-record evidence may be admissible in determining issue of "procedural unfairness"]; Code Civ. Proc., § 1094.5, subd. (e) [court may consider extra-record evidence where trial court reviews agency decision under independent judgment test].)

Actual injury is not the principle the law proceeds on. Fidelity in the agent is what is aimed at, and as a means of securing it the law will not permit him to place himself in a position in which he may be tempted by his own private interests to disregard those of his principal. This doctrine is generally applicable to private agents and trustees, but to public officers it applies with greater force, and sound policy requires that there be no relaxation of its stringency in any case that comes within its reason . . . ." (*Noble* v. *City of Palo Alto* (1928) 89 Cal.App. 47, 51 [264 P 529], citations omitted.) "[T]he common law doctrine against conflicts of interest . . . prohibits public officials from placing themselves in a position where their private, personal interests may conflict with their official duties." (64 Ops.Cal.Atty.Gen. 795, 797 (1981); accord, 70 Ops.Cal.Atty.Gen. 45, 47 (1987).)[18]

■ A leading treatise on municipal law acknowledges the same concept: "The public is entitled to have its representatives perform their duties free from any personal or pecuniary interest that might affect their judgment. Public policy forbids the sustaining of municipal action founded upon a vote of a council member . . . in any matter before it which directly or immediately affects him or her individually. . . . A finding of self-interest sufficient to set aside municipal action need not be based upon actual proof of dishonesty, but may be warranted whenever a public official, by reason of personal interest in a matter, is placed in a situation of temptation to serve his or her own purposes, to the prejudice of those for whom the law authorizes that official to act. . . . [A]n individual member ordinarily cannot vote on a matter in which that member . . . is interested. If the member does, the action taken by the body of which he or she is a member is invalidated. . . . *Where the vote of a member interested is necessary to pass an ordinance or bylaw, such ordinance or bylaw is void*, irrespective of how beneficial the ordinance may be." (4 McQuillin, The Law of Municipal Corporations (3d ed. rev. 1992) § 13.35, pp. 840-841, italics added, fns. omitted.)

■ Moreover, "[i]n conducting the hearing, the [Council] . . . has power to make final adjudications of fact in connection with matters properly submitted to it. The action of such an administrative board exercising adjudicatory functions when based upon information of which the parties were not apprised and which they had no opportunity to controvert amounts to a denial of a hearing. . . . Administrative tribunals which are required to

---

[18]While the Political Reform Act focuses on financial conflicts of interest, the common law extends to noneconomic conflicts of interest. (64 Ops.Cal.Atty.Gen., *supra*, at p. 797; 70 Ops.Cal.Atty.Gen., *supra*, at p. 47.) The common law may be abrogated by express statutory provisions (70 Ops.Cal.Atty.Gen., *supra*, at p. 47; 67 Ops.Cal.Atty.Gen. 369, 381 (1984)), but that is not the situation here.

make a determination after a hearing cannot act upon their own information, and nothing can be considered as evidence that was not introduced at a hearing of which the parties had notice or at which they were present. . . . The fact that there may be substantial and properly introduced evidence which supports the [Council's] ruling is immaterial. . . . A contrary conclusion would be tantamount to requiring a hearing in form but not in substance, for the right of a hearing before an administrative tribunal would be meaningless if the tribunal were permitted to base its determination upon information received without the knowledge of the parties. A hearing requires that the party be apprised of the evidence against him so that he may have an opportunity to refute, test, and explain it, and the requirement of a hearing necessarily contemplates a decision in light of the evidence there. introduced. . . ." (*English* v. *City of Long Beach* (1950) 35 Cal.2d 155, 158-159 [217 P.2d 22, 18 A.L.R.2d 547], citations omitted.)

Applying these principles, we conclude that the Clarks were deprived of a fair hearing in three respects.

First, under the common law, Councilmember Benz had a conflict of interest in voting on the Clarks' project. In denying the requested permits, the Council majority (which included Benz) found that the height and lot coverage of the proposed structure would interfere with the use or enjoyment of other property in the area. Also, in opposing the Clarks' 1989 application, Benz stated his belief that the project would "further constrict the view of the ocean from homes that are located behind . . . the lot." Because Benz lived one block inland of the Clarks, he stood to benefit personally by voting against the Clarks' project. It is irrelevant that Benz did not own his residence; an interest in preserving his ocean view was of such importance to him that it could have influenced his judgment.[19] Of course, a public official may express opinions on subjects of community concern (e.g., the height of new construction) without tainting his vote on such matters should they come before him. (See *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 780-781 [122 Cal.Rptr. 543, 537 P.2d 375].) Here, Benz's conflict of interest arose, not because of his general opposition to 35-foot buildings, but

---

[19]We disagree with the trial court's conclusion that Benz violated the Political Reform Act. That act generally prohibits public officials from participating in matters where they have a *financial* interest in the outcome. (Gov. Code, § 87100.) No such interest existed here because the act excludes any financial interest in real property leased by an official on a monthly basis. (Gov. Code, §§ 87103, subd. (b), 82033; Cal. Code Regs., tit. 2, § 18233.) In addition, we reject the contention that Benz's rent was less than fair market value and that this alleged "gift" from his landlord created a conflict of interest under the act. (See Gov. Code, §§ 87103, subd. (e), 82028.) The Clarks' evidence that Benz's rent was discounted consisted of the rental figures for their respective dwellings. In this context, rental information on only two dwellings in the City does not establish the fair market value of either one.

because the specific project before the Council, if approved, would have had a direct impact on the quality of his own residence. In addition, Benz's personal animosity toward the Clarks contributed to his conflict of interest; he was not a disinterested, unbiased decisionmaker. (See fn. 12, *ante*.)[20]

The City committed a second procedural error in denying the Clarks' permits. The Council's concerns about excessive lot coverage and insufficient open space were raised for the first time *after* the public portion of the March 24, 1992, hearing was over. The Clarks were not permitted to adequately address the Council on those subjects, and their request to reopen the hearing was denied. Accordingly, the Clarks did not receive proper notice or an opportunity to be heard on those two issues, both of which were resolved against them and were cited by the Council as grounds for denying the permits.

Finally, the City exhibited bias in connection with its unsuccessful effort to impose a construction moratorium. In February 1992, the Council had attempted, but failed, to enact a moratorium on the construction of buildings higher than 30 feet. The measure fell one vote short of the four votes needed. (See Gov. Code, § 65858.) Consequently, the City's 35-foot height restriction remained in effect in R-3 zones. Yet, shortly after the moratorium failed, the Council and the planning commission denied permits on three projects (including the Clarks') involving 35-foot structures. This sequence of events indicates that the City was attempting to do—by a majority vote on a project-by-project basis—what the law required a four-fifths vote of the Council to accomplish.[21] At a minimum, this evidence establishes that the Council was not impartial to the Clarks' project.

In sum, because the Council deprived the Clarks of a fair hearing, the trial court properly issued a writ of administrative mandate.[22]

---

[20]We note that "[a] councilman who is disqualified by reason of a conflict of interest in any matter shall not, once the conflict is ascertained, participate in the discussion in any way or comment on the matter in any way to any person including any councilman and shall not vote on such matter." (Hermosa Beach Mun. Code, § 2-2.19.)

[21]Our conclusion that the City was implementing an unlawful "backdoor" moratorium is supported by the fact that two of the three grounds for denying the Clarks' permits— excessive lot coverage and inadequate usable open space—were first raised by the Council after the public hearing had concluded, without ever giving the public or the Clarks an opportunity to address those issues.

[22]Because we find that the Clarks did not receive a fair hearing, we do not reach any alternative grounds for writ relief (e.g., whether substantial evidence supported the Council's decision or whether the Council violated the Subdivision Map Act (Gov. Code, § 66410 et seq.)).

## B. *The Remedy for Denial of a Fair Hearing*

 The trial court set aside the Council's decision and ordered the City to reinstate the planning commission's approval of the Clarks' permits. This was error. The trial court should have ordered the Council to rehear the matter and to provide the Clarks with a fair hearing.[23]

The necessity of another hearing follows from the language of the statute authorizing a writ of administrative mandate: "The court shall enter judgment either commanding [the council] to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court's opinion and judgment and may order [the council] to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the [council]." (Code Civ. Proc., § 1094.5, subd. (f).)

In *English* v. *City of Long Beach, supra,* 35 Cal.2d 155, the petitioner, Henry English, was dismissed from his position as an officer in the Long Beach Police Department. During the subsequent civil service proceeding, the members of the board took evidence outside the hearing. The board upheld English's dismissal. He then sought a writ of administrative mandate.

The superior court found that the civil service board had deprived English of a fair hearing and issued a writ of mandate directing that he be reinstated. The Court of Appeal agreed that the hearing had been unfair but disagreed with the trial court's remedy, stating: "Since the board, in arriving at its decision sustaining the order dismissing English, relied upon information taken outside the hearing, which English had no opportunity to refute, the trial court properly concluded that he was denied a fair hearing. [¶] The judgment, however, should not have ordered the reinstatement of English but instead should have remanded the cause to the civil service board for proper proceedings. (Code Civ. Proc., § 1094.5(e) [now subdivision (f)]; . . . .) The fact that the board has heard and decided the matter does not preclude another hearing even though the charter does not provide for a rehearing,

---

[23]On remand, when the Council rehears the appeal from the planning commission, the requirement of a "fair" hearing necessarily precludes Councilmember Benz from participating in or voting on the matter. (See pt. I.A., *ante* [discussing disqualification based on conflicts of interest].) The Clarks urge us to find that, in addition to Benz, Councilmember Edgerton is biased against them and should be disqualified. However, because this issue was not raised below on the petition for writ of mandate, we decline to reach it on appeal. (See *California Indemnity Ins. Premium Finance Co.* v. *Fireman's Fund Ins. Co.* (1995) 40 Cal.App.4th 1633, 1641 [47 Cal.Rptr.2d 743].) If the Clarks believe that any councilmember other than Benz should be disqualified in connection with the new hearing, they can raise that point during the administrative proceedings after remand.

## NOTICE TO SUBSCRIBERS

Below is a paste-over Crack-and-Peel insert for correction of an error in the bound volume report of *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, at page 1174. Please remove the correction insert from the peel-off backing and position it to cover the fourth full paragraph of text and the footnote on page 1174.

We apologize for the inconvenience. If you have any questions, please call Customer Service at 800-328-4880.

Thank you,
West Group

The superior court found that the civil service board had deprived English of a fair hearing and issued a writ of mandate directing that he be reinstated. The Supreme Court agreed that the hearing had been unfair but disagreed with the trial court's remedy, stating: "Since the board, in arriving at its decision sustaining the order dismissing English, relied upon information taken outside the hearing, which English had no opportunity to refute, the trial court properly concluded that he was denied a fair hearing. [¶] The judgment, however, should not have ordered the reinstatement of English but instead should have remanded the cause to the civil service board for proper proceedings. (Code Civ. Proc., § 1094.5(e) [now subdivision (f)]; . . . .) The fact that the board has heard and decided the matter does not preclude another hearing even though the charter does not provide for a rehearing,

---

[23] On remand, when the Council rehears the appeal from the planning commission, the requirement of a "fair" hearing necessarily precludes Councilmember Benz from participating in or voting on the matter. (See pt. I.A., *ante* [discussing disqualification based on conflicts of interest].) The Clarks urge us to find that, in addition to Benz, Councilmember Edgerton is biased against them and should be disqualified. However, because this issue was not raised below on the petition for writ of mandate, we decline to reach it on appeal. (See *California Indemnity Ins. Premium Finance Co. v. Fireman's Fund Ins. Co.* (1995) 40 Cal.App.4th 1633, 1641 [47 Cal.Rptr.2d 743].) If the Clarks believe that any councilmember other than Benz should be disqualified in connection with the new hearing, they can raise that point during the administrative proceedings after remand.

and the board cannot be said to have exhausted its power to act until it has given English a fair hearing." (*English* v. *City of Long Beach, supra,* 35 Cal.2d at pp. 159-160, citations omitted; accord, *Kumar* v. *National Medical Enterprises, Inc.* (1990) 218 Cal.App.3d 1050, 1056 [267 Cal.Rptr. 452] ["the setting aside of a final administrative decision because of unfair hearing practices requires a remand for further proceedings"]; *Zurn Engineers* v. *State of California* ex rel. *Dept. Water Resources* (1977) 69 Cal.App.3d 798, 835-838 [138 Cal.Rptr. 478] [discussing cases], cert. den. 434 U.S. 985 [54 L.Ed.2d 479, 98 S.Ct. 612].)

We recognize that there may be situations in which a superior court can properly direct that a city council's decision be set aside and that no further administrative hearings be held in the case, e.g., where the council had no authority to hear an appeal in the first place (*Cohan* v. *City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 556-559 [35 Cal.Rptr.2d 782]) or where the issuance of a building permit is a purely ministerial act, such that the council has no discretion in the matter (*Gabric* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 190-191 [140 Cal.Rptr. 619]). However, neither of those exceptions applies here. (See pt. II.A., *post* [discussing City's discretion in ruling on permit applications].)

Finally, the Clarks contend that another hearing before the Council would be improper because Councilmember Benz should have recused himself during the April 14, 1992, meeting, when the Council voted on the resolution denying the Clarks' permits. According to the Clarks, without Benz's participation at that meeting, the resulting tie vote (2-2) would have affirmed the planning commission's decision to approve their project. We disagree. While a tie vote might have affirmed the commission's decision to approve the tentative parcel map, it would not have had that effect as to the conditional use permit. This result is dictated by the different appeal provisions applicable to the two types of permits.

On appeal from a planning commission decision regarding a conditional use permit, the Council does not merely review the commission's decision for error. Rather, the Council hears the matter de novo, takes additional evidence at a public hearing, and decides whether *it* should grant or deny the permit. (Hermosa Beach Mun. Code, §§ 1411, 1412; *Gabric* v. *City of Rancho Palos Verdes, supra,* 73 Cal.App.3d at p. 191; *Lagrutta* v. *City Council* (1970) 9 Cal.App.3d 890, 894-895 [96 Cal.Rptr. 627].) In deciding an appeal, the Council "shall order that the conditional use permit be *granted, denied or modified,*" and "[t]he action by the city council . . . shall be by *three (3) affirmative* votes." (Hermosa Beach Mun. Code, §§ 1412, 1413, italics added.) In other words, the Clarks needed three affirmative

votes in the Council to obtain a conditional use permit. A tie vote would not suffice. ■ "[A]s a general rule an even division among members of an administrative agency results in no action." (*Graves* v. *Commission on Professional Competence* (1976) 63 Cal.App.3d 970, 976-977 [134 Cal.Rptr. 71].) ■ Indeed, in construing an ordinance virtually identical to the one here, we have previously held that a city council's tie vote does not affirm the underlying decision of a planning commission. (*Anderson* v. *Pittenger* (1961) 197 Cal.App.2d 188, 194-195 [17 Cal.Rptr. 54] [on appeal from planning commission's decision to grant a zoning variance, city council's tie vote constituted "no action" and "was not an affirmance of the order of the commission"]; see also *REA Enterprises* v. *California Coastal Zone Conservation Com.* (1975) 52 Cal.App.3d 596, 605-609 [125 Cal.Rptr. 201] [on appeal from regional commission's decision to issue a development permit, state commission's tie vote was not an affirmative majority vote to approve permit and therefore constituted denial of permit].)[24]

The Clarks' reliance on *Woodland Hills Residents Assn., Inc.* v. *City Council* (1975) 44 Cal.App.3d 825, 830-831 [118 Cal.Rptr. 856], and *Pacific Palisades Property Owners Assn.* v. *City of Los Angeles* (1974) 42 Cal.App.3d 781, 786 [117 Cal.Rptr. 138], is of no avail. Those decisions construed provisions of the Subdivision Map Act which provide that a tentative map shall be deemed to be approved where (1) the city council has "failed to act" upon an appeal within the statutorily specified time period and (2) the planning commission has already approved the map. (See former Bus. & Prof. Code, § 11553, as amended by Stats. 1961, ch. 194, § 4, pp. 1202-1203, now Gov. Code, § 66452.4; former Bus. & Prof. Code, § 11552, as amended by Stats. 1973, ch. 306, § 1, pp. 721-723, now Gov. Code, § 66452.5.) In both cases, the courts found that the city council's tie vote constituted a "failure to act" upon the appeal, thereby affirming the planning commission's approval of the tentative map.

Even assuming—as the Clarks contend—that the Council's tie vote would have affirmed the planning commission's decision with respect to their

[24]Under City law, "[t]ie votes shall be lost motions and may be reconsidered." (Hermosa Beach Mun. Code, § 2-2.21.) Here, a tie vote arguably would have been tantamount to "no action" on the appeal. With the votes evenly divided between granting and denying a conditional use permit, a motion either way would have failed for lack of a third vote. In this scenario, the appeal could have remained in perpetual limbo, absent a successful motion for reconsideration or a renewed motion. On the other hand, because the Council was hearing the matter de novo, a tie vote might have had the effect of denying the conditional use permit, assuming the Clarks had to prove they were entitled to it. (See *Committee for a Rickel Alternative* v. *City of Linden* (1988) 111 N.J. 192, 196-203 [543 A.2d 943, 945-949] [where affirmative vote of majority of city council was required to reverse, remand, or affirm decision of board of adjustment, and council heard matter de novo with burden of proof on applicant, tie vote resulted in denial of use variance].) In any event, without deciding whether a tie vote would have *denied* the conditional use permit, we conclude that it would not have affirmed the planning commission's decision in that respect.

tentative parcel map *and* precise development plan, this argument overlooks the significance of the tie vote as to the conditional use permit. The language of the Hermosa Beach Municipal Code, not the Subdivision Map Act, would govern the outcome on that issue. As discussed above, a tie vote of the Council does not affirm the planning commission's decision on a conditional use permit, nor does it operate to grant the permit. The critical provision in the Subdivision Map Act—deeming the map approved if the council fails to act by a certain deadline—does not appear in the municipal code. Rather, City law mandates three affirmative Council votes for a conditional use permit; there is no "deemed approval" provision, nor is there a time limit for acting on the appeal.[25]

Unquestionably, the Clarks needed all three permits—a tentative parcel map, precise development plan, and conditional use permit—to proceed with the project. (See Hermosa Beach Mun. Code, §§ 7.2-4, 29.5-1 to 29.5-18, 1431.) Because a tie vote of the Council would not have affirmed the planning commission's decision as to all three permits, it follows that the Clarks' project would not have been approved even if Councilmember Benz had recused himself.

Accordingly, on remand, the trial court shall direct the Council (1) to vacate its decision on the appeal from the planning commission and (2) to rehear the appeal and provide the Clarks with a fair hearing.[26]

II

*Federal Civil Rights Claim*

■■■ The trial court properly found that the Council had deprived the Clarks of a fair hearing under state law (Code Civ. Proc., § 1094.5, subd.

---

[25]Although the Council is supposed to announce its decision within 60 days after the public hearing, it is authorized to give notice to the parties that the decision will be announced at some later time. (Hermosa Beach Mun. Code, § 1412.) The municipal code does not impose any ultimate deadline where the Council gives notice that the decision will take more than 60 days.

[26]In September 1992, five months after the Clarks' permits were denied, the Council enacted an ordinance imposing a 30-foot height limitation in R-3 zones. (See fn. 9, *ante*.) The question thus arises as to whether the new height restriction applies to the Clarks' project. Significantly, the new limitation was formally proposed and adopted after the Council heard the appeal on the Clarks' permits. To allow the City to invoke the new height limitation now would sanction the Council's mishandling of the administrative appeal and would leave the Clarks without a remedy. Accordingly, the height ordinance in effect at the time of the Council's prior decision should apply to the future development of the Clarks' project, absent some state statute dictating otherwise. (See *Ross* v. *City of Yorba Linda* (1991) 1 Cal.App.4th 954, 968-970 [2 Cal.Rptr.2d 638]; *Gabric* v. *City of Rancho Palos Verdes, supra,* 73 Cal.App.3d at pp. 202-203; *Keizer* v. *Adams* (1970) 2 Cal.3d 976, 980-981 [88 Cal.Rptr. 183, 471 P.2d 983]; see also Gov. Code, §§ 66474.2, 65961; *Golden State Homebuilding Associates* v. *City of Modesto* (1994) 26 Cal.App.4th 601, 606-610 [31 Cal.Rptr.2d 572].)

(b)). The Clarks' civil rights claim was premised on the theory that the lack of a fair hearing also violated the due process clause of the United States Constitution.

Given that state law mandates a "fair" administrative proceeding and that the due process clause is similarly based on the concept of fairness (*Applebaum* v. *Board of Directors, supra*, 104 Cal.App.3d at p. 657), it may appear at first blush that a violation of state law in this case should give rise to liability under the federal Constitution. Obviously, this is not the first time a plaintiff has attempted to convert a state law claim into a fed eral case of constitutional proportions. (See, e.g., *Stivers* v. *Pierce* (9th Cir. 1995) 71 F.3d 732, 740-741 & fn. 4 [applying due process clause where Nevada state law recognized property interest in occupational license].)[27] ██ ██ However, we conclude that while the City violated state law by failing to provide a fair hearing, it did not offend the federal Constitution, on either procedural or substantive due process grounds.[28]

## A. *Procedural Due Process*

 A state law requirement that a public entity conduct hearings in a fair manner does not automatically implicate the federal due process clause. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." Nonetheless, before reaching any question about the fairness of a particular proceeding under the federal Constitution, we must first address whether a protected interest—life, liberty, or property—is implicated. If no such interest is involved, then the procedural protections of the due process clause do not come into play. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 569-578 [33 L.Ed.2d 548, 556-562, 92 S.Ct. 2701]; *Zorzi* v. *County of Putnam* (7th Cir. 1994) 30 F.3d 885, 895.) Because the Clarks do not contend that the Council's decision implicated an interest involving life or liberty, we examine whether they had a federally protected property interest in the development of their project.

---

[27]The trial court's resolution of the Clarks' civil rights claim followed a three-day bench trial. Accordingly, we apply the substantial evidence test to its findings of fact and independently review its conclusions of law. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 278-286, pp. 289-298; *Masonite Corp.* v. *Superior Court* (1994) 25 Cal.App.4th 1045, 1050-1051 [31 Cal.Rptr.2d 173].)

[28]As the Supreme Court has explained: "This Court has held that the Due Process Clause protects individuals against two types of government action. So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty,' . . . When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. . . . This requirement has traditionally been referred to as 'procedural' due process." (*United States* v. *Salerno* (1987) 481 U.S. 739, 746 [95 L.Ed.2d 697, 708, 107 S.Ct. 2095], citations omitted.)

At the outset, we note that several federal courts have cautioned against applying title 42 United States Code section 1983 (section 1983) to state and local land-use disputes. As the Fourth Circuit Court of Appeals has noted: " '[T]he regulation of land subdivision is . . . a fundamental legal tool for municipal guidance of land development.' . . . Indeed, land-use decisions are a core function of local government. Few other municipal functions have such an important and direct impact on the daily lives of those who live or work in a community. The formulation and application of land-use policies, therefore, frequently involve heated political battles, which typically pit local residents opposed to development against developers and local merchants supporting it. . . . [¶] Resolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials is simply not the business of the federal courts. There is no sanction for casual federal intervention into what 'has always been an intensely local area of the law.' . . . [A]llowing 'every allegedly arbitrary denial by a town or city of a local license or permit' to be challenged under § 1983 would 'swell[] our already overburdened federal court system beyond capacity.' . . . Accordingly, federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes. Section 1983 does not empower us to sit as a super-planning commission or a zoning board of appeals, and it does not constitutionalize every ' "run of the mill dispute between a developer and a town planning agency." ' . . . In most instances, therefore, decisions regarding the application of subdivision regulations, zoning ordinances, and other local land-use controls properly rest with the community that is ultimately—and intimately—affected." (*Gardner* v. *Baltimore Mayor & City Council* (4th Cir. 1992) 969 F.2d 63, 67-68, followed in *Sylvia Development Corp.* v. *Calvert County, Md.* (4th Cir. 1995) 48 F.3d 810, 828-829, citations omitted.)

Similarly, the First Circuit Court of Appeals has commented: "Virtually every alleged legal or procedural error of a local planning authority or zoning board of appeal could be brought to a federal court on the theory that the erroneous application of state law amounted to a taking of property without due process. Neither Congress nor the courts have, to date, indicated that section 1983 should have such a reach. [¶] . . . [¶] . . . Plaintiffs would thus have us rule that the due process clause to the United States Constitution was violated when [the Town of] Bolton's Planning Board, for the purpose of protecting what it viewed as the town's basic character, openly interpreted state subdivision laws and a state court decision in ways which frustrated plaintiffs' large-scale housing development of a particular design. [¶] . . . *Every* appeal by a disappointed developer from an adverse ruling by a local . . . planning board necessarily involves some claim that the board exceeded, abused or 'distorted' its legal authority in some manner, often for

some allegedly perverse (from the developer's point of view) reason. It is not enough simply to give these state law claims constitutional labels such as 'due process' or 'equal protection' in order to raise a substantial federal question under section 1983. As has been often stated, '[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution.' " (*Creative Environments, Inc.* v. *Estabrook* (1st Cir. 1982) 680 F.2d 822, 831, 832-833, cert. den. 459 U.S. 989 [74 L.Ed.2d 385, 103 S.Ct. 345], followed in *Chesterfield Dev.* v. *City of Chesterfield* (8th Cir. 1992) 963 F.2d 1102, 1104-1105.)

 With these cautionary words in mind, we turn to the Supreme Court's analysis in *Board of Regents* v. *Roth, supra*, 408 U.S. 564, to determine what qualifies as a property interest for due process purposes: "Certain attributes of 'property' interests protected by procedural due process emerge from [our] decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. . . . Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (*Id.* at p. 577 [33 L.Ed.2d at p. 561].)

 "When analyzing whether a plaintiff presents a legitimate claim of entitlement, we focus on the degree of discretion given the decisionmaker and not on the probability of the decision's favorable outcome." (*Jacobs, Visconsi & Jacobs* v. *City of Lawrence* (10th Cir. 1991) 927 F.2d 1111, 1116.) "Under this approach, whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency lacks *all* discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest. . . . Under this standard, a cognizable property interest exists 'only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured.' . . . Moreover, the standard focuses on the amount of discretion accorded the issuing agency by law, not on whether or to what degree that discretion is actually exercised. 'Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally

protected property interest.' . . ." (*Gardner* v. *Baltimore Mayor & City Council, supra*, 969 F.2d at 68, citations omitted; accord, *Crowley* v. *Courville* (2d Cir. 1996) 76 F.3d 47, 52; *Bateson* v. *Geisse* (9th Cir. 1988) 857 F.2d 1300, 1303, 1305.)[29]

■ In this case, we cannot say that the discretion of the Council was so narrowly circumscribed that approval of the Clarks' application was virtually assured. The planning commission and the Council were vested with sufficient discretion to defeat any expectation that the Clarks' application would be approved *as submitted.* In that regard, we think it important to define as precisely as possible the property interest at stake. The Clarks do not (and cannot) claim that the City has infringed their interest in constructing a home per se. The City did not bar the Clarks from building their condominium project altogether; it denied their application without prejudice to submitting a revised plan reflecting the Council's concerns about height, lot coverage, and usable open space. Thus, the interest at issue is not that of a landowner to construct a roof over his head; rather, it is the Clarks' interest in building a structure having the specific dimensions they find desirable. The due process inquiry therefore requires us to examine the discretion accorded the City in placing restrictions on the size of a structure.

As a prerequisite to building their project, the Clarks had to obtain a conditional use permit, a precise development plan, and a tentative parcel map. Under City law, a conditional use permit must "assure that the degree of compatibility shall be maintained with respect to the particular use on the particular site and in consideration of other existing and potential uses within the general area in which such use is proposed to be located." (Hermosa Beach Mun. Code, § 1404.) A precise development plan is designed "to achieve a reasonable level of quality, compatibility, in harmony with the community's social, economic and environmental objectives, and to protect existing and potential developments, and uses on adjacent and surrounding property." (*Id.,* § 1430.)[30]

"All development shall be in compliance with minimum standards of the zoning ordinance." (Hermosa Beach Mun. Code, § 1432(A).) However,

---

[29]This standard "appropriately balances the need for local autonomy in a matter of paramount local concern with recognition of constitutional protection at the very outer margins of municipal behavior. The standard represents a sensitive recognition that decisions on matters of local concern should ordinarily be made by those whom local residents select to represent them in municipal government—not by federal courts. It also recognizes that the Fourteenth Amendment's Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions." (*Gardner* v. *Baltimore Mayor & City Council, supra*, 969 F.2d at p. 69.)

[30]A tentative parcel map is required "to insure that the costs of land divisions and the burdens thereof are borne by the property owners and those interested in the land and not by the general public." (Hermosa Beach Mun. Code, § 29.5-1.)

"[o]n a case basis, the planning commission may impose standards *above the minimums* designated by the zoning ordinance to improve the quality of development and to mitigate any environmental impacts." (*Ibid.*, italics added.) Further, the decisions of the planning commission are subject to appeal to the Council. (*Id.*, §§ 29.5-5, 1409, 1435.) Where an appeal involves a conditional use permit, the Council "shall order the . . . permit be granted, denied or modified *subject to such conditions or limitations that it may impose.*" (*Id.*, § 1412, italics added.)

Here, the Council's reasons for denying the Clarks' project concerned *minimum* standards, not absolutes or guarantees. Under City law, "[n]o building shall *exceed* thirty-five (35) feet in height" (Hermosa Beach Mun. Code, § 601, italics added); "[a]ll buildings . . . shall not cover *more than* sixty-five (65) percent of the area of the lot" (*id.*, § 606, italics added); and "there shall be a *minimum* of two hundred (200) square feet of usable open space per dwelling unit," plus an additional 100 square feet per condominium unit (*id.*, §§ 607, 7.2-6(e)(1), italics added).

In our view, these provisions do not create a legitimate expectation or claim of entitlement to a structure having any particular dimensions. For instance, the municipal code does not create a *right* to a 35-foot structure; it simply allows a maximum height of 35 feet. In examining permit applications on a case-by-case basis, the City is expressly authorized to consider numerous factors in imposing more restrictive conditions on a specific project.[31] Moreover, in this case, even if the Council misinterpreted or misapplied the ordinances concerning lot coverage and usable open space, nothing in the municipal code guaranteed that the Clarks could build to the maximum lot coverage of 65 percent or get by with the minimum open space of 300 square feet per condominium unit. Indeed, in hearing the appeal on the Clarks' project, the Council had the broad authority to modify the conditional use permit "subject to such conditions or limitations that it may impose."

In sum, the municipal code vests significant discretion in the City in reviewing project applications and in imposing conditions on development permits. (See *Smith* v. *County of Los Angeles* (1989) 211 Cal.App.3d 188, 197 [259 Cal.Rptr. 231] ["a conditional use permit . . . is, by definition,

---

[31]Some of those factors, as listed in the municipal code, include the distance of the project from existing residential uses and the impact of the proposed use to the City's infrastructure. (Hermosa Beach Mun. Code, § 1432(B).) Of importance, the last of these "general criteria" reads as follows: "Other considerations that, in the judgment of the planning commission, are necessary to assure compatibility with the surrounding uses, and the city as a whole." (*Id.*, § 1432(B)(10).) This language grants the City substantial discretion in deciding whether, and under what conditions, to approve a development project.

discretionary"]; *Guinnane* v. *San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732, 736 [257 Cal.Rptr. 742] ["compliance with the zoning laws and building codes did not entitle [plaintiff] to a building permit as a matter of course"], cert. den. 493 U.S. 936 [107 L.Ed.2d 319, 110 S.Ct. 329]; *Gardner* v. *Baltimore Mayor & City Council, supra,* 969 F.2d at p. 67 [land-use control "is an inherently discretionary system"].)[32] We therefore join those federal courts recognizing that, in these circumstances, there is no federally protected property interest on which to base a procedural due process claim. (See, e.g., *Jacobs, Visconsi & Jacobs* v. *City of Lawrence, supra,* 927 F.2d at pp. 1115-1118; *Bateson* v. *Geisse, supra,* 857 F.2d at p. 1305; *Creative Environments, Inc.* v. *Estabrook, supra,* 680 F.2d at pp. 829-834; *Arroyo Vista Partners* v. *County of Santa Barbara* (C.D.Cal. 1990) 732 F.Supp. 1046, 1052-1053.)

Accordingly, the trial court erred in finding a violation of procedural due process.

## B. *Substantive Due Process*

 As a substantive limitation on governmental action, the due process clause precludes arbitrary and irrational decisionmaking. (*Crowley* v. *Courville, supra,* 76 F.3d at p. 52; *Zorzi* v. *County of Putnam, supra,* 30 F.3d at p. 895; *Gardner* v. *Baltimore Mayor & City Council, supra,* 969 F.2d at p. 68.) However, not every governmental error constitutes a violation of substantive due process.

In fact, given the nebulous contours of substantive due process, courts have begun to restrict its reach to certain "core" values. The Supreme Court has noted: " 'As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." (*Albright* v. *Oliver* (1994) 510 U.S. 266, 271-272 [127 L.Ed.2d 114, 122, 114 S.Ct. 807, 812].)

---

[32]We reject the Clarks' argument that the City's discretion is substantially restricted by the municipal code's criteria for denying a precise development plan. The code states that such a plan can be denied where "[t]he proposed development would substantially depreciate property values in the vicinity or interfere with the use or enjoyment of property in such area, because of excessive dissimilarity or inappropriateness of design in relation to the surrounding vicinity, and *there are no known conditions of approval which can be imposed that could resolve such problems.*" (Hermosa Beach Mun. Code, § 1432(C)(1), italics added.) If anything, this provision indicates that the City has substantial latitude in developing and imposing restrictions on a project in order to avoid denying an application altogether.

The Ninth Circuit Court of Appeals, sitting en banc, has recently echoed this same sentiment: "We are all painfully aware that the area of substantive due process 'has at times been a treacherous field' for the courts. . . . In an effort to scale back what had become an apparently unbounded source of judicial authority, the Supreme Court in recent decades has restricted the scope of substantive due process. [¶] There can be no doubt that the Due Process Clause of the Fourteenth Amendment confers both procedural and substantive rights. . . . *However, the use of substantive due process to extend constitutional protection to economic and property rights has been largely discredited.* . . . Rather, recent jurisprudence restricts the reach of the protections of substantive due process primarily to liberties 'deeply rooted in this Nation's history and tradition.' . . . Thus, the Fourteenth Amendment protects against a State's interferences with 'personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education,' as well as with an individual's bodily integrity." (*Armendariz* v. *Penman* (9th Cir. 1996) 75 F.3d 1311, 1318-1319, citations omitted, italics added.) Consequently, there is some question as to whether substantive due process even applies to the type of case before us.

 In any event, assuming that substantive due process remains a viable check on state and local land-use decisions, "a party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution." (*Crowley* v. *Courville*, *supra*, 76 F.3d at p. 52; accord, *Zorzi* v. *County of Putnam*, *supra*, 30 F.3d at p. 895; *Gardner* v. *Baltimore Mayor & City Council*, *supra*, 969 F.2d at p. 68.) If a cognizable property interest is implicated, a court must then determine whether the government's action was arbitrary or irrational. (*Crowley* v. *Courville*, *supra*, 76 F.3d at p. 52; *Zorzi* v. *County of Putnam*, *supra*, 30 F.3d at p. 895; *Gardner* v. *Baltimore Mayor & City Council*, *supra*, 969 F.2d at p. 68.)

As indicated in our discussion of the Clarks' procedural due process claim, they have no protected property interest in their requested permits. (See pt. II.A, *ante*.) Accordingly, the substantive due process claim fails for that reason alone. Alternatively, even if a constitutionally recognized property interest is involved, we find that the City did not engage in arbitrary or irrational conduct.

In *PFZ Properties, Inc.* v. *Rodriguez* (1st Cir. 1991) 928 F.2d 28, certiorari dismissed 503 U.S. 257 [117 L.Ed.2d 400, 112 S.Ct. 1151], a developer (PFZ) brought a section 1983 action against a Puerto Rico agency for refusing to process its building plans. In rejecting PFZ's substantive due process claim, the First Circuit Court of Appeals stated: "[R]ejections of

development projects and refusals to issue building permits do not ordinarily implicate substantive due process. . . . Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation. . . . The doctrine of substantive due process 'does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents "governmental power from being used for purposes of oppression," or "abuse of government power that shocks the conscience," or "action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests." ' " (928 F.2d at pp. 31-32, citations omitted, quoted with approval in *Stubblefield Construction Co.* v. *City of San Bernardino* (1995) 32 Cal.App.4th 687, 709-710 [38 Cal.Rptr.2d 413], cert. den. [133 L.Ed.2d 205, 116 S.Ct. 300].)

Applying these principles in *PFZ Properties*, the First Circuit concluded: "[W]e hold that PFZ's allegations that [government] officials failed to comply with agency regulations or practices in the review and approval process for the construction drawings are not sufficient to support a substantive due process claim under the Fourteenth Amendment to the United States Constitution. . . . Even assuming that [the agency] engaged in delaying tactics and refused to issue permits for the . . . project based on considerations outside the scope of its jurisdiction under Puerto Rico law, such practices, without more, do not rise to the level of violations of the federal constitution under a substantive due process label." (928 F.2d at p. 32, citation omitted.)

In *Uhlrig* v. *Harder* (10th Cir. 1995) 64 F.3d 567, certiorari denied __ U.S. __ [133 L.Ed.2d 853, 116 S.Ct. 924], the Tenth Circuit Court of Appeals explained that "the standard for judging a substantive due process claim is whether the challenged government action would ' "shock the conscience" of . . . judges.' . . . [¶] . . . [¶] . . . [T]o satisfy the 'shock the conscience' standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct. We do know, however, that the 'shock the conscience' standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort . . . ." (64 F.3d at pp. 573-574, citing *Collins* v. *Harker Heights* (1992) 503 U.S. 115, 126, 128 [117

L.Ed.2d 261, 273-274, 275, 112 S.Ct. 1061].) As the high court has recognized, "The Due Process Clause 'is not a guarantee against incorrect or ill-advised [governmental] decisions.'" (*Collins* v. *Harker Heights, supra,* 503 U.S. at p. 129 [117 L.Ed.2d at p. 275].)

■ In this case, regardless of whether the Council's decision was proper under state law, we cannot say that its conduct, for due process purposes, was arbitrary or oppressive or that it "shocks the conscience." Although we have concluded that Councilmember Benz had a conflict of interest in voting on the project, the city attorney advised the Council at the public hearing that there was no conflict. That advice was incorrect, but it was not irrational. In light of the city attorney's opinion, the Council did not act irrationally by allowing Benz to participate in the proceedings.[33]

Plainly, the Council erred in considering and deciding issues raised for the first time after the public hearing was over. Further, it *may have* misconstrued or misapplied the provisions of the zoning ordinance concerning lot coverage and usable open space. Nonetheless, the Council's ultimate decision to deny the permits did not lack a rational basis.

The Council's application of the zoning ordinance was not wholly without reason. With respect to limiting the height of the Clarks' structure to 30 feet, there was evidence that most of the homes in the area were 30 feet in height or lower. Similarly, the Council's interpretation and application of the provisions on lot coverage and usable open space were not irrational.[34] Moreover, we cannot overlook the fact that several members of the community opposed the Clarks' project, signing petitions to appeal the planning commission's decision and speaking against the project at the Council hearing. "After all, a legislator is supposed to respond to the concerns of his or her constituents . . . . Whether their concerns were proper or justified is not the issue here. The point is that their elected representative[s] decided to oppose the project . . . . 'The opinion of area residents concerning neighborhood preservation is an appropriate factor for consideration in zoning decisions.'" (*Stubblefield Construction Co.* v. *City of San Bernardino, supra,* 32 Cal.App.4th at p. 711.)

---

[33]The city attorney's advice was limited to whether there was a conflict of interest based on (1) the proximity of Benz's residence to the Clarks' property and (2) Benz's opposition to the Clarks' 1989 project. No one raised the issue of Benz's personal animosity toward the Clarks (see fn. 12, *ante*), and the city attorney, apparently unaware of that basis for disqualification, did not address it. As far as we can tell, none of the other councilmembers knew about that issue either.

[34]We agree with the City that the planning commission's interpretation of the lot coverage provision is not binding on the Council. To hold otherwise would defeat the purpose of allowing an appeal from the commission to the Council.

In sum, because the Council's decision did not implicate a protected property right, and because its conduct was not irrational, the trial court erred in finding a violation of substantive due process.[35]

## III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to issue a writ of administrative mandate commanding the Hermosa Beach City Council (1) to set aside its decision overturning the planning commission's approval of the Clarks' project, (2) to rehear the appeal from the planning commission's decision, and (3) to provide the Clarks with a fair hearing on the matter. The trial court is further directed to recalculate the costs recoverable by the Clarks in accordance with Code of Civil Procedure section 1033.5. The parties are to bear their respective costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

A petition for a rehearing was denied September 11, 1996, and respondents' petition for review by the Supreme Court was denied November 13, 1996.

---

[35]As stated, in addition to finding that the Clarks' due process rights were violated, the trial court also found that Councilmember Benz had violated the Political Reform Act and that the Council had violated the Brown Act and the Subdivision Map Act. Even if these state statutes were violated, such misconduct would add nothing to the Clarks' section 1983 claim. "Only *federal* rights, privileges, or immunities are protected by the section. Violations of state law alone are insufficient." (*Ybarra* v. *Bastian* (9th Cir. 1981) 647 F.2d 891, 892, cert. den. 454 U.S. 857 [70 L.Ed.2d 153, 102 S.Ct. 309], italics added; accord, *Ebmeier* v. *Stump* (8th Cir. 1995) 70 F.3d 1012, 1013 & fn. 6; *Love* v. *Pepersack* (4th Cir. 1995) 47 F.3d 120, 124, fn. 5, cert. den. __ U.S. __ [133 L.Ed.2d 27, 116 S.Ct. 64].)

*See footnote, *ante*, page 1152.