Filed 12/21/22  Redondo Beach Waterfront v. City of Redondo Beach CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| REDONDO BEACH WATERFRONT, LLC, | B311039 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC682833 |
| v. | |
| CITY OF REDONDO BEACH, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge. Affirmed.

Shumener, Odson & Oh, Betty M. Shumener, John D. Spurling, and Daniel E. French for Plaintiff and Appellant.

Office of the City Attorney for the City of Redondo Beach, Michael W. Webb and Cheryl Yeun Shin Park; Mintz Levin Cohn Ferris Glovsky and Popeo, Jonathan Welner, Antony D. Nash, Nada I. Shamonki, and Kathryn L. Ignash for Defendant and Respondent.

# INTRODUCTION

This is the second appeal in this lawsuit between Redondo Beach Waterfront, LLC (RBW or the developer) and the City of Redondo Beach (City) arising out of a dispute over a proposed development project (Project) for the City's Redondo Beach King Harbor Pier area (Waterfront).

In this case's first appeal, *Redondo Beach Waterfront, LLC v. City of Redondo Beach* (Apr. 27, 2020, B292007 [nonpub. opn.]) (*Redondo I*), we partially reversed the trial court's order denying the City's special motion to strike RBW's complaint under Code of Civil Procedure section 425.16 (anti-SLAPP statute or Section 425.16). We concluded that two of the complaint's allegations targeted the City's protected activities—(1) the City's submission of a local voter initiative to the California Coastal Commission (Coastal Commission) for its review and certification; and (2) the participation of three conflicted City officials in decisions affecting RBW's interests in the Project. We remanded the matter for the court to determine in the first instance whether RBW demonstrated any of its claims based on the City's protected activities have minimal merit.

In this appeal, RBW challenges the court's order granting in part and denying in part the City's anti-SLAPP motion issued after our decision in *Redondo I*. Specifically, RBW contends the court erred in finding the developer failed to show it was likely to prevail on its substantive due process and breach of contract claims arising out of the City's submission of the local voter initiative to the Coastal Commission. We affirm.

## FACTUAL BACKGROUND

### 1.    The Project

The City has long wanted to revitalize the Waterfront, an area popular for its restaurants, shops, and other seaside attractions. In 2010, the City's residents passed Measure G, authorizing the City to renovate 150,000 square feet of existing building area and create 400,000 square feet of new development in the Waterfront area. The Coastal Commission later certified Measure G, amending the City's local coastal program (LCP) to permit new development in the Waterfront area.

Because the City couldn't fund the new development on its own, it formed a public-private partnership with RBW's predecessor-in-interest. In 2013, RBW and the City executed various agreements to facilitate RBW's development of the Project. RBW then invested more than $15 million to develop a plan for the Project, which included the construction and renovation of more than 500,000 square feet of retail space, restaurants, cinemas, hotels, parking lots, a public boat ramp, a seaside lagoon, and other facilities.

In June 2016, RBW sought approval of the Project, including approval of a vesting tentative tract map. On June 23, 2016, the City notified RBW that its application for approval of vesting tentative tract map was "deemed complete."

In August 2016, the Harbor Commission approved several entitlements for the Project, including an environmental impact report (EIR), a coastal development permit, a conditional use permit, a Harbor Commission design review, and the vesting tentative tact map. In October 2016, following an appeal of the Harbor Commission's decision, the Redondo Beach City Council (City Council) passed a resolution approving RBW's entitlements

3

for the project. The resolution noted that the City's approval of the vesting tentative tract map "shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards described in Section 66474.2 of the Government Code of the State."

**2.    The Agreement for Lease of Property and Infrastructure Financing (ALPIF)**

As of January 2017, the Project was moving forward as planned. That month, the City and RBW executed the ALPIF, which, among other things, merged the parties' prior agreements and identified specific parcels of land that the City was required to lease to RBW. In exchange, RBW would construct and renovate certain infrastructure within the Waterfront area.

The first paragraph of Section 303 of the ALPIF requires the City to work "cooperatively" with RBW "to assist in coordinating the expeditious processing and consideration of all necessary permits, entitlements, and approvals." That same paragraph provides that the "City shall … retain complete discretion to amend the general plan, zoning or other land use designations or requirements applicable to the Waterfront Project Site," except that such amendments "shall not modify any obligations the City may have under existing laws with respect to vested rights for the Waterfront Project."

The second paragraph of Section 303 states that "[i]n no event shall … [the] City's amendment of the general plan, zoning or other land use designations applicable to the Lease Parcels, Seaside Lagoon or Developer Improvements, be deemed a breach or Default of" the ALPIF.

Section 706 of the ALPIF states that the agreement does not constitute a " 'development agreement' as defined in

4

Government Code section 65864, et seq.," nor does the agreement "grant any vested rights to [RBW] or provide any assurance to [RBW] that upon approval of the [Project], [RBW] may proceed with the [Project] in accordance with existing policies, rules and regulations, and conditions of approval." Instead, the ALPIF "provides that [the Project] will be required to comply with any applicable rules, regulations and policies governing permitted uses of the land, density, design, improvement and construction standards and specifications applicable to [the project], whether or not in conflict with rules, regulations or policies existing as of the date of this Agreement, except as [RBW] may already have obtained vested rights to develop [the Project] in accordance with the existing general plan, zoning, vesting tentative tract map, or other land use designations or requirements currently applicable to the [Project]."

**3.    Measure C**

In June 2016, while RBW was securing its entitlements, some City residents and others opposed to the Project submitted a "Notice of Intent to Circulate Petition" to the City, seeking to place a local initiative—the King Harbor Coastal Access, Revitalization, and Enhancement Act (Measure C)—on the ballot for the next general municipal election. In December 2016, after proponents gained sufficient signatures, Measure C was placed on the ballot for the City's March 2017 election.

The argument in favor of Measure C was prepared by a group called Rescue Our Waterfront and was signed by City Councilmember Bill Brand, and future Councilmembers Todd Loewenstein and Nils Nehrenheim. According to Rescue Our Waterfront, Measure C would stop construction of "a waterfront mall adding 13,136 daily car trips and doubling development."

5

Opponents of Measure C argued it would result in City taxpayers themselves paying for the necessary repairs to the waterfront area. The City Attorney's analysis that accompanied the ballot materials cautioned that Measure C, if approved, would not necessarily prevent the planned Project from going forward.

In March 2017, the City's voters passed Measure C. Section 2(A)(4) of Measure C states that the "additions to the Zoning Ordinance for the Coastal Zone" contained in the initiative "are not intended to authorize and do not authorize the use of any parcel of land other than a use that is designated in the city's certified LCP as a permitted use of the parcel." Section 8 of Measure C provides in relevant part: "If a majority of Redondo Beach voters vote in favor of this Act, its provisions shall apply to any project concerning which development rights have not vested as of the date the initiative petition that contains this Act was found to have qualified for placement on the ballot."

During the same election in which Measure C passed, Brand was elected as the City's mayor and Loewenstein was elected to a seat on the City Council. Nehrenheim, who faced a runoff election, was elected to a seat on the City Council later that year. All three candidates had run on an "anti-Waterfront [Project] platform."

In April 2017, the City notified RBW that the passage of Measure C triggered the ALPIF's force majeure clause[1] and, as a

_____

[1] The force majeure clause appears in Section 702 of the ALPIF. That clause provides in relevant part: "In addition to specific provisions of this Agreement, performance by either Party hereunder shall not be deemed to be in Default, and all performance and other dates specified in this Agreement shall be extended, where delays or Defaults are due to causes beyond the control or without the fault of the Party claiming an extension of time to perform, which may include, without

6

result, the City's performance concerning the Project would be delayed. The City explained that it was unknown whether the Coastal Commission would certify or modify Measure C and, if so, what effect the initiative would have on the City's ability to perform under the ALPIF. According to the City, its performance of "certain obligations under the ALPIF with respect to the design, approval and construction of a boat ramp" may be "delayed or prevented as a result of the passage of Measure C and the need for final Coastal Commission approvals … ."

In May 2017, the City Council discussed passing a resolution sending Measure C to the Coastal Commission for certification. At that meeting, Mayor Brand "suggested adding a section to the [r]esolution stating 'City Council hereby requests that the California Coastal Commission hear and consider the amendments of Measure C before considering any other coastal development permits.' "

The City Council voted to pass the resolution sending Measure C to the Coastal Commission for certification. The Resolution stated Measure C amended two sections of the City's Municipal Code, which had previously been certified by the Coastal Commission as part of the City's LCP. The Resolution further stated that because the City was required by law to submit to the Coastal Commission any proposed amendments to that plan, the City was sending Measure C to the Commission.

---

limitation, the following: … delays caused by litigation, initiative or referendum; … [or] acts or failures to act of any other public or governmental agency or entity (other than the acts or failures to act of City which shall not excuse performance by City)."

7

Mayor Brand's suggested language was not included in the version of the resolution that the City Council passed.

4. **RBW's Petition for Writ of Mandate and *Redondo Beach Waterfront, LLC v. City of Redondo Beach* (2020) 51 Cal.App.5th 982 (*Redondo II*)**

In early 2017, RBW filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the City, asserting that Measure C is invalid and unconstitutional and, in any event, is inapplicable to the Project. Relevant here, RBW's request for declaratory relief sought an order for, among other things, a declaration that Measure C could not be applied retroactively to the project because RBW's statutory rights under Government Code section 66498.1 had vested prior to the initiative's passage. A group of residents opposed to the project intervened in the lawsuit to represent the interests of Measure C's proponents. The parties and the court agreed to resolve the question of Measure C's impact on RBW's statutory vested rights as a matter of law, through a motion for judgment on the pleadings filed by RBW.

After hearing oral argument, the court ruled on the motion for judgment on the pleadings. At the threshold, the court found the matter was ripe for declaratory relief. Specifically, the court found the City took at least two steps to apply Measure C in a manner adverse to RBW's vested rights by: (1) notifying RBW that Measure C triggered the ALPIF's force majeure clause; and (2) later terminating the ALPIF.

The court then found RBW obtained statutory vested rights against the City, entitling the developer to proceed with the Project in accordance with its vesting tentative tract map. Under Government Code section 66498.1, the court explained, RBW's

8

rights would have vested when the city approved or conditionally approved a vesting tentative tract map. Since the City deemed RBW's vesting tentative tract map complete in June 2016 and the City Council approved the map by resolution in October 2016, all of which occurred before voters passed Measure C in March 2017, the court found RBW's rights vested before Measure C was passed. Consequently, the court concluded, the City couldn't apply Measure C against RBW with respect to the Project. The court entered judgment in favor of RBW, and the intervening residents appealed.

In *Redondo II*, we affirmed the court's judgment. We held that under the plain language of Government Code section 66498.1, RBW's "right to proceed with the [Waterfront] Project vested as to the City on June 23, 2016, well before City residents passed Measure C in March 2017." (*Redondo II, supra*, 51 Cal.App.5th at p. 994.) Thus, we concluded, once RBW's rights vested, the City was "prohibited from applying subsequently amended local ordinances, standards, and policies—such as the amended ordinances contained in Measure C—to the [Waterfront] Project." (*Id*. at p. 998.) We noted, however, that under Government Code section 66498.6, subdivision (b), RBW's vested rights did not curtail "either the applicability of the Coastal Act or the oversight provided by the Coastal Commission" because courts "have consistently recognized the supremacy of the Coastal Act over matters of local concern." (*Redondo II,* at p. 998.)

5. **RBW's Federal Lawsuit**

In June 2017, RBW sued the City in federal court, alleging the City deprived RBW of due process, violated the contracts

clause of the federal Constitution, and breached the ALPIF. RBW also sought declaratory relief against the City.

In August 2017, the City sent RBW a letter claiming the developer breached the ALPIF's forum selection clause by filing a complaint against the City in federal court. Several days later, the City accused RBW of repudiating a reimbursement agreement between the parties.

In October 2017, the City sent RBW a "Notice of Termination," stating the City was terminating the ALPIF based on the developer's alleged breaches of that agreement, including the developer's filing a lawsuit against the City in federal court.

RBW's federal lawsuit was dismissed in January 2018.

### 6.     The Current Lawsuit

In December 2017, RBW filed a complaint against the City in state court, alleging the City breached the ALPIF. RBW alleged it had invested more than $15 million to develop the Project before the City terminated the ALPIF based on pretextual breaches by RBW. The complaint asserted four causes of action against the City: (1) deprivation of substantive due process rights under 42 U.S.C. section 1983 (Section 1983); (2) deprivation of procedural due process rights under Section 1983; (3) breach of contract; and (4) declaratory relief.

RBW alleged the City breached the ALPIF and violated the developer's due process rights by engaging in the following conduct: "(1) failing to protect, and indeed jeopardizing, [RBW's] property and contractual rights, permits, and Vesting Tentative Tract Map and/or to ensure that it would be able to perform its own obligations under the ALPIF: (2) seeking out a new development partner when the City is obligated to lease portions of the Waterfront to [RBW] under the ALPIF; (3) seeking to

10

redesign the Waterfront Project to the exclusion of [RBW]; (4) allowing officials who have a clear conflict of interest to continue to make decisions and/or participate in decisions or conduct that affect the ALPIF and [RBW's] rights thereunder; (5) refusing to allow [RBW] access to records as required under Section 207 of the ALPIF; (6) failing to submit the complete application for the required boat ramp … to the Coastal Commission within 90 days after the effective date of the ALPIF; (7) using the Reimbursement Agreement, which has been superseded by the ALPIF and is 'of no further force and effect', to manufacture a breach; (8) using the filing of the Federal Complaint to manufacture defaults under the ALPIF; and (9) declaring a forfeiture/termination of the ALPIF when it had no right to do so."

### 7. The City's Anti-SLAPP Motion

The City filed an anti-SLAPP motion, arguing RBW's complaint targeted the City's protected activity. The motion challenged only four of the breaches and violations alleged in RBW's complaint: (1) the City's failure to protect RBW's vested rights, including the City's passage of Measure C and submission of the initiative to the Coastal Commission; (2) communicating with a new partner to develop the Waterfront area; (3) seeking a redesign of the development for the Waterfront area; and (4) allowing conflicted City officials to participate in decisions affecting the ALPIF. As to the merits of RBW's claims, the City argued, among other things, that the developer could not prevail on its breach of contract cause of action based on the City's submission of Measure C to the Coastal Commission because Section 303 of "the ALPIF states that the City has full authority to amend the land use regulations governing the [Project] and

11

that no such change to the land use regulations shall constitute a breach of contract."

RBW opposed the City's motion, arguing, among other things, the City's conduct was not "SLAPPable" because "the collective action of a government entity" is not entitled to protection under the anti-SLAPP statute. Acknowledging some courts have held government conduct may in some instances constitute protected activity, RBW asserted the City's conduct giving rise to the developer's lawsuit was neither "speech" nor "expressive activity," but rather "breaches of the ALPIF and violations of Gov. Code § 66498.1." Specifically, RBW argued "it is not the City's 'petitioning' or 'campaigning' for Measure C that gives rise to [RBW's] claims—it is the City's attempts to deprive [RBW] of its contractual and vested rights, such as attempting to retroactively apply Measure C to [RBW] in violation of Government Code section 66498.1 … ."

The court denied the City's anti-SLAPP motion in its entirety. The court found the City's passing of a resolution to submit Measure C to the Coastal Commission for review and certification was not protected activity. According to the court, "[t]he City passing a resolution is not conduct arising from protected activity" because " '[a]cts of governance mandated by law, without more, are not exercises of free speech or petition.' "

As for the City allowing conflicted officials to participate in decisions affecting the ALPIF, the court found such conduct was not protected by the anti-SLAPP statute because RBW's allegations didn't implicate any conduct by the City, as opposed to the City's individual councilmembers. At most, the court reasoned, the conduct underlying RBW's allegations was "basically any official decision made by the City involving the

12

ALPIF, which … does not implicate protected activity." The court also found the remaining alleged breaches of the ALPIF and violations of RBW's due process rights were not protected activity under the anti-SLAPP statute. The court did not address whether RBW demonstrated a probability of prevailing on the merits of any of its claims.

The City appealed.

### 8.    *Redondo I*

In *Redondo I*, we affirmed in part and reversed in part the court's order denying the City's anti-SLAPP motion. Specifically, we reversed the court's order to the extent it found the City's submission of Measure C to the Coastal Commission and the participation of conflicted City officials in decisions affecting the ALPIF did not constitute protected activity.

As to the City's submission of Measure C to the Coastal Commission, we concluded such conduct was "petitioning" activity that is protected by the anti-SLAPP statute. We explained that "[s]ending Measure C to the Coastal Commission furthered the City's right to petition because the City sought administrative action, namely to have the Commission certify the proposed amendments to the City's coastal plan." Since the "development of the City's waterfront area had been an ongoing subject of public debate, discussion, and controversy for several years," we held the City's submission of Measure C to the Coastal Commission concerned a public issue under the anti-SLAPP statute.

We also held the participation of conflicted City officials in decisions affecting the ALPIF was protected activity. Specifically, the acts of City officials in drafting Measure C and campaigning on anti-Project platforms were protected as written or oral

13

statements or writings made before a legislative proceeding under subdivision (e)(1) of the anti-SLAPP statute. Finally, we held the City's communications with new development partners and its attempts to redesign the development of the Waterfront area was not protected by the anti-SLAPP statute because such conduct did not form the basis of RBW's alleged injuries.

We remanded the matter with directions for the court to consider in the first instance whether RBW had demonstrated a reasonable probability of prevailing on its causes of action arising out of the City submitting Measure C to the Coastal Commission and allowing conflicted officials to participate in decisions affecting the ALPIF.

## 9.    Proceedings on Remand from *Redondo I*

After we remanded the matter, the court allowed the parties to submit supplemental briefs addressing whether there was a reasonable probability RBW could prevail on its claims arising out of the City's protected activities. Both parties submitted briefs.

RBW argued that once the City agreed its obligations under the ALPIF were subject to RBW's vested rights, the City accepted the risk that subsequent changes to local land use ordinances— such as Measure C—would defeat its performance under the ALPIF. RBW also argued it was likely to prevail on its due process claims because the City allowed conflicted officials who ran on anti-Waterfront Project platforms to make decisions that adversely affected RBW's statutory vested rights and contractual rights under the ALPIF.

The City argued the passage of Measure C and its decision to submit the initiative to the Coastal Commission for review and certification did not breach the ALPIF. According to the City, it

14

was obligated by law to submit the initiative to the Coastal Commission and, once it did so, it was up to the Coastal Commission to determine whether the initiative could be applied to the Project.

As for RBW's claims arising out of the participation of conflicted City officials in decisions adversely affecting the developer's vested rights and contractual interests, the City argued the developer submitted no evidence to establish any of the City's officials had a qualifying conflict of interest.

The court granted the City's anti-SLAPP motion in part and denied it part. The court found RBW was not likely to prevail on any of its claims arising out of the allegation that the City improperly sought to retroactively apply Measure C to the Project through its submission of the initiative to the Coastal Commission. As for RBW's allegation that the City allowed conflicted officials to participate in decisions affecting RBW's interests under the ALPIF, the court found RBW was reasonably likely to prevail on its procedural due process and declaratory relief claims, but not its claim for breach of contract.

Addressing the City's submission of Measure C to the Coastal Commission, the court explained that such conduct could not support RBW's breach of contract or due process claims because the City's conduct was obligatory under Public Resources Code[2] section 30514, which requires municipalities to submit "[a]ny proposed amendments to a certified local coastal program," such as an initiative like Measure C, to the Commission for review and certification. (§ 30514, subd. (a).) The court also

---

[2] All undesignated statutory references are to the Public Resources Code.

rejected RBW's contention that once the City entered the ALPIF, "the City accepted the risk that [a] subsequent change in the law (such as Measure C) would defeat its performance under" that agreement. The court explained: "RBW's vested rights as to the City do not preclude the Coastal Commission from regulating the Waterfront Project. As set forth [in *Redondo II*], the Coastal Commission 'has the ultimate authority to ensure that coastal development conforms to the policies embodied in the state's Coastal Act.' [Citation.] Thus, 'the vested statutory rights flowing from a local agency's approval of a vesting tentative map bind the local agency—not the state.' [Citation.] Based on this, it cannot be concluded as a matter of law that the City's agreement that it was subject to RBW's vested rights means that it was accepting the risk of a performance-defeating change in the law when neither 'the applicability of the Coastal Act [nor] the oversight provided by the Coastal Commission is curtailed by RBW's vested rights.' "

RBW appeals.

## DISCUSSION

RBW contends the court erred when it granted the City's anti-SLAPP motion challenging the developer's allegations that the City breached the ALPIF and violated the developer's substantive due process rights when it submitted Measure C to the Coastal Commission for certification. We disagree.

RBW concedes the City was authorized to enact Measure C and that the City was required to submit the initiative to the Coastal Commission for that agency's review under the Coastal Act of 1976 (Act) (§ 30000 et seq.). Thus, according to RBW, none of its claims arise out of either of those acts. Instead, RBW asserts it is the City's request that the Coastal Commission

16

"certify" Measure C that constitutes a breach of the ALPIF and a violation of the developer's substantive due process rights. According to RBW, such conduct was wrongful because it amounted to the City "petitioning a state agency to amend [the City's] LCP to kill [the] Project."

As we explain, nothing in the ALPIF prohibited the City from asking the Coastal Commission to certify Measure C. Thus, RBW cannot show such conduct constituted a breach of that agreement. Likewise, the City's request that the Coastal Commission certify the initiative did not violate RBW's substantive due process rights because it was neither arbitrary nor irrational, and RBW has not shown it resulted in a deprivation of any protected rights. Rather, the City's submission of Measure C to the Coastal Commission was an exercise of the City's authority to regulate local land use pursuant to the wishes of the City's electorate. The court, therefore, properly found RBW was not reasonably likely to prevail on any of its claims arising out of the City's submission of Measure C to the Coastal Commission.[3]

## 1.    General Principles of the Anti-SLAPP Statute

Under the anti-SLAPP statute, a defendant may move to strike claims " 'arising from any act … in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019)

---

[3] RBW does not dispute that the court's finding that the developer's claim for declaratory relief arising out of the City's submission of Measure C to the Coastal Commission rises and falls with its substantive due process and breach of contract claims.

17

7 Cal.5th 871, 884.) Section 425.16 does not completely insulate a defendant's protected speech but instead provides a mechanism "for weeding out, at an early stage, *meritless* claims arising from" protected activity. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

Courts apply a two-prong test when evaluating an anti-SLAPP motion. (*Baral*, *supra*, 1 Cal.5th at p. 384.) Under the first prong, the defendant must establish that the challenged claim arises from activity protected by Section 425.16. (*Baral*, at p. 384) If the defendant establishes the plaintiff's claims arise out of protected activity, the burden shifts to the plaintiff at the second prong to demonstrate a probability of prevailing on its claims. (*Ibid*.)

At the second prong, the plaintiff must make a prima showing of facts to sustain a favorable judgment. (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1368.) The court conducts an analysis akin to evaluating a summary judgment motion. (*Baral*, *supra*, 1 Cal.5th at p. 384.) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [The court] accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Id.* at pp. 384–385.) If the plaintiff makes a prima facie showing of a likelihood of success, the court should deny the anti-SLAPP motion unless, as a matter of law, the defendant's evidence defeats the plaintiff's claim. (*Wong*, at p. 1368.)

We independently review whether a plaintiff demonstrated its claims have minimal merit under the anti-SLAPP statute. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672.)

## 2. The Coastal Act and the Amendment of Local Land Use Ordinances in Coastal Zones

Before addressing the merits of RBW's claims, we provide a brief overview of the procedure a local government must follow when enacting and amending local land use laws governing land falling within the State's coastal zone.

The Act is a "comprehensive scheme [governing] land use planning for the entire coastal zone of California." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 (*Yost*).) Relevant here, the Act establishes the procedure through which LCPs are prepared, adopted, certified, amended, and periodically reviewed. (*Security National Guaranty, Inc. v. California Coastal Commission* (2008) 159 Cal.App.4th 402, 419–420 (*Security National*).) An LCP includes, among other things, a local government's land use plans, zoning ordinances, and zoning district maps for areas falling within the coastal zone. (§ 30108.6.)

Under the Act, any local government whose land lies partially or entirely within the coastal zone, like the City, must prepare an LCP. (*Yost, supra*, 36 Cal.3d at p. 566; § 30500, subd. (a).) "The precise content of each [LCP] shall be determined by the local government … in full consultation with the commission and with full public participation." (§ 30500, subd. (c).) Once it has created a proposed LCP, "the local government must then submit [it] to the [Coastal] Commission for certification." (*Security National, supra*, 159 Cal.App.4th at p. 420; § 30512.)

The Coastal Commission must review a proposed LCP to determine whether it complies with the policies and

19

requirements of the Act. (§ 30512, subds. (a) & (c).) If the proposed LCP complies with the Act, the Coastal Commission must certify it. (*Id.*, subd. (c).) In reviewing a proposed LCP, the Coastal Commission is prohibited from "diminish[ing] or abridg[ing] the authority of the local government to adopt and establish, by ordinance, the precise content of its land use plan." (§ 30512.2, subd. (a).) In other words, " 'the Commission in approving or disapproving an LCP does not create or originate any land use rules and regulations. It can approve or disapprove but it cannot itself draft any part of the coastal plan.' " (*Yost*, *supra*, 36 Cal.3d at p. 572.)

The Act establishes a similar procedure for amending a local government's LCP and other land use laws governing land in the coastal zone. (*Security National*, *supra*, 159 Cal.App.4th at p. 422.) Specifically, section 30514, subdivision (a) provides: "A certified local coastal program and all local implementing ordinances, regulations, and other actions may be amended by the appropriate local government, but no such amendment shall take effect until it has been certified by the commission." All proposed amendments must be submitted to, and processed by, the Coastal Commission under similar procedures governing the review and certification of a proposed LCP. (*Id.*, subd. (b).) The Act defines an " 'amendment of a certified local coastal program' " as including, but not limited to, "any action by a local government that authorizes the use of a parcel of land other than a use that is designated in the certified local costal program as a permitted use of the parcel." (*Id.*, subd. (e).)

In short, a local government must submit a proposed LCP, and any new ordinances that may amend an existing LCP or existing local implementing ordinances, regulations, and other

20

actions, to the Coastal Commission for review and certification. (§§ 30500 & 30514.)

3. **The City's submission of Measure C to the Coastal Commission does not support a claim for breach of contract.**

To prevail on a claim for breach of contract, the plaintiff must prove: (1) the existence of a contract; (2) the plaintiff's performance, or excuse for nonperformance, under the contract; (3) the defendant's breach of the contract; and (4) the plaintiff's damages flowing from the defendant's breach. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) As we explain, the court properly found RBW was not likely to prevail on its claim for breach of contract arising out of the City's submission of Measure C to the Coastal Commission because nothing in the ALPIF precluded the City's conduct.

RBW points to no language in the ALPIF that expressly bars the City from asking the Coastal Commission to "certify" an ordinance that could affect the Project. Indeed, such language appears nowhere in the parties' agreement. That is not surprising because the second paragraph of Section 303 of the ALPIF expressly states that "[i]n no event" shall the City be liable for a breach of the agreement based on its "amendment of the general plan, zoning or other land use designations applicable to the Lease Parcels, Seaside Lagoon or the Developer Improvements [i.e., the Project]." In other words, under the express terms of the ALPIF, the City is permitted to amend its land use laws that apply to the Project, such as through the amendments included in Measure C.

For the same reason, the City was permitted to submit Measure C to the Coastal Commission for review and possible

21

certification. As we noted above, RBW does not dispute that the City could enact Measure C and was "required" to submit the initiative to the Coastal Commission "so that the agency could evaluate" it. Indeed, as we explained above, the Act requires a local government to submit to the Coastal Commission for review and certification any proposed amendments to a "certified local coastal program and all local implementing ordinances, regulations, and other actions." (§ 30514, subd. (a).) Under the terms of the Act, an amendment to an LCP cannot go into effect until the Coastal Commission "certifie[s]" it or, following an expedited procedure, determines that the amendment is "minor" or "de minimis." (§ 30514.) Accordingly, as part of the statutorily prescribed process for amending land use laws that fall within the coastal zone, the City was required to submit Measure C to the Coastal Commission. Thus, under Section 303 of the ALPIF, the City was allowed to submit Measure C to the Coastal Commission for review and possible certification.

RBW contends the City nevertheless breached the ALPIF when it asked the Coastal Commission to "certify" Measure C, as opposed to asking the agency to "review" or "evaluate" the initiative to determine whether it constituted an "amendment" to the City's LCP requiring certification. This argument lacks merit.

RBW cites no authority establishing that a request for the Coastal Commission to certify, as opposed to a request for the agency to review or evaluate, a proposed land use amendment carries any legal significance. That is, RBW points to no case law or statute that says the Coastal Commission must treat differently a local government's request for certification of a proposed land use amendment versus a request for review or evaluation of a proposed land use amendment. In any event, even

if a request for certification of a proposed land use amendment was legally significant, such a request would be permitted under Section 303 of the ALPIF, as that provision authorizes the City to amend its land use laws applicable to the Project without limitation on the nature of the amendment.

RBW next contends that the City's request that the Coastal Commission certify Measure C violates the spirit of other provisions of the ALPIF. We disagree.

According to RBW, the City's efforts to certify Measure C run afoul of a clause in the first paragraph of Section 303 that requires City staff to "work cooperatively with [RBW] to assist in coordinating the expeditious process and consideration of all necessary permits, entitlements, and approvals." Specifically, RBW asserts "the City sought amendment of the LCP **so that RBW would not be able to obtain its permits to complete the Project.** Because RBW's vested rights bound the City, but not [the] Coastal [Commission], having [that agency] certify Measure C ensured that the Project could not move forward despite RBW's vested rights." (Emphasis in original.) But, as the trial court found, the City Council's resolution sending Measure C to the Coastal Commission did not mention any permits pending before that agency, nor did the resolution ask the agency to apply Measure C to stop or otherwise hinder the Project.[4] Thus, the

---

[4] As we noted above, Mayor Brand proposed adding language to the resolution asking the Coastal Commission to wait to consider "any other coastal development permits" until after it reviewed Measure C. But, in the end, that language was not included in the resolution sending Measure C to the Coastal Commission. Thus, Mayor Brand's proposed language does not support a claim that the City's submission of Measure C to the Coastal Commission breached the ALPIF.

City's submission of Measure C to the Coastal Commission for review and certification, by itself, does not support a claim that the City violated the cooperation clause of Section 303.

RBW also relies on language in Section 706 that requires RBW to comply with any land use related rules, regulations, or policies affecting the Project, regardless of whether those rules, regulations, or policies were in effect at the time the parties signed the ALPIF, "except as [RBW] may already have obtained vested rights to develop the [Project] in accordance with existing general plan, zoning, vesting tentative tract map, or other land use designations or requirements currently applicable to the Lease Parcels and Seaside Lagoon." In RBW's view, Section 706 bars the City from asking the Coastal Commission to certify Measure C. We are not persuaded.

It is clear from the title and content of Section 706 that the provision defines the nature of the ALPIF. The title of Section 706 is: "**Not a Development Agreement."** The first sentence of that provision (which RBW does not address) explains that the ALPIF is not a development agreement under Government Code section 65865 that would, by its terms alone, grant RBW contractually enforceable vested rights to proceed with the Project under the City's land use laws existing at the time of the agreement's execution. (See *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 442–444 (*Mammoth Lakes*) [a development agreement executed under Government Code section 65865 is enforceable despite subsequent changes to a municipality's land use laws].) The second sentence of that provision states that the ALPIF does not grant RBW any vested rights or provide RBW "any assurance to the [developer] that upon approval of the [Project], the

24

[developer] may proceed with the [Project] in accordance with existing policies, rules and regulations, and conditions of approval." And the fourth (and final) sentence of Section 706 states that "the Parties agree that this Agreement is not a development agreement as defined in Government Code Section 65865, *et seq.*"

To be sure, the third sentence of the provision acknowledges that RBW does not have to comply with any local land use laws that went into effect after RBW obtained statutory vested rights in the Project. But nothing in Section 706 precludes the City from amending its own land use laws, including asking the Coastal Commission to certify any amendments to the City's laws. Indeed, such language would conflict with the second paragraph of Section 303.

At the very least, RBW contends, the City's request that the Coastal Commission certify Measure C violates the ALPIF's implied covenant of good faith and fair dealing. Under California law, each contract includes an implied covenant of good faith and fair dealing that prevents one of the parties from engaging in conduct that frustrates the other parties' rights to the benefits of the contract. (*Cobb v. Ironwood Country Club* (2015) 233 Cal.App.4th 960, 965–966.) "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372.) "[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Id.* at p. 373.) Where the challenged conduct is "within the bounds of the contract's express terms," it does not violate the implied covenant of good faith and fair dealing. (*Id.* at pp. 373–

25

374 ["it was certainly within the reasonable expectations of the parties" that the defendant might engage in conduct expressly permitted by the parties' agreement].)

As we explained above, Section 303 of the ALPIF expressly permits the City to amend its land use laws applicable to the Project. Because the City was required under the Act to submit Measure C to the Coastal Commission for the agency's review and possible certification, its request that the Coastal Commission certify Measure C does not violate the ALPIF's implied covenant of good faith and fair dealing. In other words, any effort by the City to amend its LCP and other land use laws applicable to the Project is within the parties' reasonable expectations based on the express terms of the ALPIF.

Finally, RBW argues this case is analogous to *Mammoth Lakes*. There, a developer and the Town of Mammoth Lakes (Town) entered into a development agreement under Government Code section 65865, subdivision (a) to improve the Town's airport and to build a hotel or condominium project at the airport. (*Mammoth Lakes*, *supra*, 191 Cal.App.4th at pp. 440, 444–447.) The Town later decided it did not want to proceed with the project as planned in the development agreement and sought the assistance of the Federal Aviation Administration (FAA) to " 'get rid of' " the proposed condominium or hotel project. (*Id*. at p. 449.) After discussions with Town officials, the FAA objected to the project and threatened to cut off the Town's federal funding for the airport. (*Id*. at pp. 449–450.) Although the developer demanded the Town move forward with the project as originally planned, the Town refused to complete the project unless the parties resolved the FAA's objections. (*Id*. at pp. 450–451.) A jury

found the Town breached the development agreement and awarded the developer $30 million in damages. (*Id.* at p. 453.)

The Court of Appeal affirmed the jury's verdict. (*Mammoth Lakes*, *supra*, 191 Cal.App.4th at p. 477.) The court's decision turned on the fact that the parties had entered into a development agreement as defined in Government Code section 65865. (*Mammoth Lakes*, at pp. 442–444, 466–468.) As the court explained, "[a] development agreement is a statutorily-authorized agreement between a municipal government (here, the Town) and a property owner for the development of the property," which freezes "the municipality's rules, regulations, and policies governing permitted uses of land and density of the land use, as well as standards and specifications for design improvement, and construction." *(Id.* at p. 442.) Thus, once the development agreement is approved by ordinance, it is "enforceable despite subsequent changes in the municipality's land use laws." (*Id.* at p. 443.) Because the Town refused to perform its contractual obligations without the parties' completion of a condition not contemplated by the development agreement, the Town breached that agreement. (*Id.* at pp. 466–468.)

RBW's reliance on *Mammoth Lakes* is misplaced because, as we just explained, the ALPIF expressly states that it is not a development agreement under Government Code section 65865. Unlike the agreement at issue in *Mammoth Lakes*, the ALPIF does not, through its execution alone, grant RBW any contractually enforceable vested rights in the Project. The holding in *Mammoth Lakes*, therefore, does not apply here.

In short, the court did not err when it found RBW was not likely to prevail on its claim for breach of contract based on the City's submission of Measure C to the Coastal Commission.

### 4. The City's submission of Measure C to the Coastal Commission does not support a substantive due process claim.

RBW also contends the court erred when it found the developer was not likely to prevail on its claim that the City's submission of Measure C to the Coastal Commission violated the developer's substantive due process rights. We are not persuaded.

"Substantive due process protects against arbitrary government action." (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 855 (*Las Lomas*).) To prevail on a substantive due process claim under Section 1983, the plaintiff must establish: (1) it had a "valid property interest within the meaning of the [United States] Constitution"; and (2) the government's conduct implicating that property interest was arbitrary or irrational. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1184 (*Clark*).)

Here, RBW contends, and the court found, that RBW's statutory vested rights in the Project are constitutionally protected. Assuming RBW and the court are correct, RBW nevertheless cannot prevail on its substantive due process claim because nothing in the record supports a finding that the City's submission of Measure C to the Coastal Commission was arbitrary or irrational. (*Clark*, *supra*, 48 Cal.App.4th at p. 1184.)

It is well-established that " '[r]ejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process.' " (*Clark*, *supra*, 48 Cal.App.4th at p. 1184, quoting *PFZ Properties, Inc. v. Rodriguez* (1st Cir. 1991) 928 F.2d 28, 31; see also *Las Lomas*, *supra*, 177 Cal.App.4th at p. 856 ["Typical land use disputes involving alleged procedural irregularities, violations of state law, and

28

unfairness ordinarily do not implicate substantive due process."].) " 'The doctrine of substantive due process "does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents 'governmental power from being used for purposes of oppression,' or 'abuse of governmental power that shocks the conscience, or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.' " [Citations.]' " (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 709–710 (*Stubblefield*).)

Thus, to satisfy the second prong of a substantive due process claim, the challenged government action must amount to "some form of outrageous or egregious conduct constituting 'a true abuse of power.' " (*Las Lomas*, *supra*, 177 Cal.App.4th at p. 856.) The plaintiff must show more than an intentional or reckless abuse of government power. (*Clark*, *supra*, 48 Cal.App.4th at p. 1185.) Instead, " 'the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.' " (*Ibid.*)

In *Stubblefield*, our colleagues in Division Two of the Fourth District held that a city council's decision to block a development project on facts similar to those here did not support a substantive due process claim. (*Stubblefield*, *supra*, 32 Cal.App.4th at pp. 708–712.) In that case, a developer sought to build an apartment complex on 600 acres of land. (*Id.* at p. 696.) The developer agreed to allow the city to annex the property in exchange for the city's promise that it would provide the necessary zoning for the project. (*Ibid.*) Later, the city proposed a zoning ordinance that would adversely affect the project if the

29

ordinance was applied to it. (*Id*. at p. 697.) After the city promised the developer that the new ordinance wouldn't be applied to the project, a council member who vigorously opposed the project sponsored an urgency ordinance that defeated the city's assurance. (*Id*. at pp. 697–698.) Following passage of the urgency ordinance, the city council killed the project. (*Id*. at p. 700.)

In concluding the city council's conduct did not violate the developer's substantive due process rights, the court in *Stubblefield* explained, "the record demonstrates actions of the City Council that responded to concerns of constituents in the affected area and other political concerns. Specifically, the [council member's] alleged vendetta … against the project has not been shown to be an arbitrary and irrational action as a matter of substantive due process. It is not uncommon or unusual for a legislator to oppose a project and to use all means within his or her power to defeat it. After all, a legislator is supposed to respond to the concerns of his or her constituents, and there is ample evidence in the record here that persons living in the vicinity of the project were concerned about it. Whether the concerns were proper or justified is not the issue here. The point is that their elected representative decided to oppose the project, and did so vigorously." (*Stubblefield, supra*, 32 Cal.App.4th at pp. 710–711.)

In *Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, the reviewing court held that allegations that city council members acted out of personal animosity toward a developer when they blocked a proposed project were insufficient to support a substantive due process claim. (*Id*. at pp. 184–186.) The court explained that a government official's motivation for

voting on land use issues is irrelevant to determining whether there has been a due process violation. (*Id*. at p. 184, citing *Landgate, Inc v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1022 ["The proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter."].) Similarly, in *Las Lomas*, this division held that a council member's vigorous opposition to a proposed project and misleading public statements about the project did not support a substantive due process claim because such conduct, if proven, was not "an outrageous or egregious abuse of power of constitutional dimension." (*Las Lomas*, *supra*, 177 Cal.App.4th at p. 857.)

The City's submission of Measure C to the Coastal Commission did not violate RBW's substantive due process rights. As a threshold matter, the City was required under the Act to submit Measure C to the Coastal Commission once voters passed the initiative. (See § 30514, subd. (a).) Thus, the City's act was neither irrational nor arbitrary—it was mandated by law.

Even if we were to assume it was improper for the City to ask the Coastal Commission to "certify" Measure C, as opposed to simply submitting the initiative to the agency for review, the City's conduct was not egregious, oppressive, or conscience shocking. (*Clark*, *supra*, 48 Cal.App.4th at p. 1185.) Measure C was passed by a majority of voters who participated in the City's March 2017 election. Measure C's proponents advocated for the initiative on an anti-Project platform. That is, the official arguments in favor of Measure C claimed the initiative could stop, or at least reduce the scope of, the Project. In other words, it

31

is clear that at least some of the City's electorate who voted for Measure C opposed the Project. Thus, even if we were to assume the City intended to hinder the Project by submitting Measure C to the Coastal Commission, such conduct was done in furtherance of the concerns of the City's constituents. As the court in *Stubblefield* explained, even if the concerns of a city's electorate are not "proper or justified," those concerns are " 'an appropriate factor for consideration in zoning decisions' " when evaluating a substantive due process claim. (*Stubblefield*, *supra*, 32 Cal.App.4th at p. 711.)

In short, the court properly found RBW was not likely to prevail on its substantive due process claim arising out of the City's submission of Measure C to the Coastal Commission.

## DISPOSITION

The order granting in part and denying in part the City's anti-SLAPP motion is affirmed. The City shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.